**Rosie QUARLES, et al.,
Plaintiffs-Appellees,**

v.

**Fred ST. CLAIR, individually and as Commissioner of the Mississippi State Department of Public Welfare, et al., Defendants-Appellants.**

Nos. 78–2112, 81–4190.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1983.

John Bowie Watson, Baltimore, Md., for Dept. of Health and Human Services.

Maudine G. Eckford, Lexington, Miss., David F. Baughn, Vicksburg, Miss., Dennis L. Horn, Hazelhurst, Miss., for plaintiffs-appellees.

Darold L. Rutland, Child Support Div., State Dept. of Public Welfare, Jackson, Miss., for State defendants-appellants.

Before WILLIAMS and JOLLY, Circuit Judges, and WILL *, District Judge.

---

* District Judge of the Northern District of Illinois, sitting by designation.

1. As set out, *infra,* the Child Support Enforcement Act, Pub.L. No. 93–647 established both

JERRE S. WILLIAMS, Circuit Judge.

This consolidated appeal involves two challenges to Mississippi's administration of two, interrelated, Social Security Act programs which benefit certain needy children: the Aid to Families with Dependent Children (AFDC) program, 42 U.S.C. §§ 601–610; and the Child Support and Establishment of Paternity (CSE) program, 42 U.S.C. §§ 651–662. Because of codification in Part D of title IV of the Social Security Act, the CSE program has become known as the "IV–D" program.[1] These challenges are class actions which focus upon the intended effect of the 1975 amendments to the Social Security Act upon the states with regard to: 1) the extent to which child support payments collected on behalf of AFDC recipients from the absent parent may be retained by the state as reimbursement to the state and federal governments for past AFDC payments made, pursuant to 42 U.S.C. § 602(a)(28); and 2) the obligations placed upon the states to "provide for entering into cooperative arrangements with appropriate courts and law enforcement officials," pursuant to 42 U.S.C. § 654(7). Plaintiffs are Mississippi AFDC recipients subject to the challenged regulations. Defendants are the state of Mississippi and the federal agency, the Department of Health and Human Services (HHS), charged with administering the Social Security Act programs at issue.

The District Court for the Northern District of Mississippi held that Mississippi's practices as to both issues stated above were in contravention of congressional intention and that the Department of Health and Human Services was wrong in interpreting the 1975 amendments to authorize the Mississippi practices.

We agree with the district court that Congress, by its 1975 amendments, did not authorize states to retain the magnitude of child support payments which Mississippi

the CSE, or IV–D, program and amended the AFDC program provisions appearing elsewhere in Title IV of the Social Security Act.

does even though the state was in compliance with the HHS interpretation. We disagree, however, with the court's conclusion that Congress required states *in all cases* to effect "cooperative arrangements with appropriate courts and law enforcement officials." Instead, we conclude that Section 654(7) does not require agreement, but does require that the states must pave the way for such agreements by the enactment of enabling legislation and the removal of statutory impediments. Further, the states must make reasonable, good faith attempts to reach agreement with their appropriate courts and law enforcement officials. We thus affirm in part and reverse in part.

### I. *Child Support Payments: To Have and to Hold?*

#### A. *Overview*

The Aid to Families with Dependent Children (AFDC) program is a federal-state cooperative effort administered by the states. It was established to "encourag[e] the care of dependent children..., to help maintain and strengthen family life and to help such parents and relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection...." 42 U.S.C. § 601. The program provides assistance to families deprived of child support by one or both parents, through death, disability or absence, when "countable income"[2] falls below a specified "standard of need,"[3] resulting in a "budget deficit."[4] Most states provide aid payments to make up the full budget deficit. Mississippi, eleven other states, and Puerto Rico did not provide full "budget deficit" payments at the time critical to this case.[5] In Mississippi, an AFDC recipient would get the *lesser* of: 1) 40% of the "budget deficit;" or 2) the prescribed family maximum grant, which varied in accordance with family size.[6]

Before 1975, monthly "countable income" included child support payments the AFDC parent received each month from the divorced or otherwise absent parent.[7] Child support was counted as income for the month in which it was received, regardless of whether the amount received reflected that month's child support obligations alone or included additional sums paid for past or future obligations, or merely reflected an excess payment. If this "countable income"—earnings plus child support—exceeded the "standard of need," the AFDC parent would be ineligible for assistance in that month.

In 1975, the law was amended to provide that child support payments would no longer be included in countable income. Instead, the state could require individuals to assign to the state their rights to child support payments as a condition of AFDC eligibility, 42 U.S.C. § 602(a)(26). The state was authorized to retain these child support payments collected "as reimbursement for any past assistance payments made to the family for which the State has not been reimbursed...." 42 U.S.C. § 657(b). Mississippi requires child support assignment pursuant to this 1975 amend-

---

**2.** "Countable income" is income minus such items as the costs incurred in earning *the money, e.g., day care* expenses. *See* 45 C.F.R. § 233.20(a)(7).

**3.** "Standard of need" is that amount of money determined to be necessary for subsistence for a family of a given size.

**4.** The "budget deficit," therefore, is that amount by which a family's monthly income falls short of that minimum sum, the "standard of need," deemed necessary for the family's subsistence.

**5.** The time that Congress considered the 1975 amendments to the Social Security Act is the

critical time. The other states were: Arizona, Arkansas, Georgia, Indiana, Maine, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, Virginia, and Wyoming. *See* note 38 *infra.*

**6.** At the time this suit was filed, Mississippi's AFDC family maximum was $108 per month, calculated as follows: $30 a month for the first child, $18 a month for the second child, and $12 a month for each additional child up to a total of seven.

**7.** "Child support" is the legal, enforceable obligation of parents to contribute to the economic maintenance of their children. It is that money paid by one parent to another toward the expenses of children of the marriage.

ment. Section 657(b) was enacted as part of the IV–D program as an incentive to the states themselves to get them to aid in enforcing and collecting delinquent child support obligations. That section [8] distinguishes between state retention of those sums currently owed and those sums in excess of the month's obligations; it permits the states to retain all "excess" payments to the extent reimbursement is owed the state. 42 U.S.C. § 657(b)(3).

The 1975 amendments included an additional provision, however, intended to ameliorate the harsh effect of these child support assignment and government AFDC-reimbursement provisions in the "gap" states, such as Mississippi, which do not provide a dollar-for-dollar payment of the "budget deficit." Specifically, Section 602(a)(28) was enacted when Congress realized that AFDC families in the gap states would lose disposable income under these assignment and reimbursement provisions. The AFDC families because of the amendments could no longer fill the gap between their less than full AFDC benefits and their standard of need level with their child support entitlements since the state had obtained the right to collect and retain those payments as a condition to AFDC eligibility. Thus, Section 602(a)(28) provided that "any portion of the amounts collected in any particular month as child support ... which [prior to the 1975 amendments] would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount of aid otherwise payable to such family...," 42 U.S.C. § 602(a)(28).[9]

The parties agree that this section was intended to require the gap states to take into account the "amounts collected in any particular month as child support" and to return to the AFDC recipient that portion of those amounts which would fill the gap up to the point of ineligibility, *i.e.* one dollar less than the standard of need. The parties disagree, however, on whether the child support collections which the state must return pursuant to Section 602(a)(28) are limited to the *current* month's entitlement or whether the state must consider those amounts received which are in *excess* of the monthly obligation—arrearages for past months or mere overpayments.[10]

8. Section 657(b) provides:
  (b) The amounts collected as support by a State pursuant to a plan approved under this part during any fiscal year beginning after September 30, 1976, shall be distributed as follows:
  (1) such amounts as are collected periodically which represent monthly support payments shall be retained by the State to reimburse it for assistance payments to the family during such period (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing);
  (2) such amounts as are in excess of amounts retained by the State under paragraph (1) and are not in excess of the amount required to be paid during such period to the family by a court order shall be paid to the family; and
  (3) such amounts as are in excess of amounts required to be distributed under paragraphs (1) and (2) shall be (A) retained by the State (with appropriate reimbursement of the Federal Government to the extent of its participation in the financing) as reimbursement for any past assistance payments made to the family for which the State has not been reimbursed or (B) if no assistance payments have been made by

the State which have not been repaid, such amounts shall be paid to the family.

9. Section 602(a)(28) provides:
  (a) A State plan for aid and services to needy families with children must ...
  (28) provide that, in determining the amount of aid to which an eligible family is entitled, any portion of the amounts *collected in any particular month as child support* pursuant to a plan approved under part D of this subchapter and retained by the State under section 657 of this title, which (under the State plan approved under this part as in effect both during July 1975 and during that particular month) would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount of aid otherwise payable to such family under the State plan approved under this part; (emphasis added).

10. Too frequently, the divorced or otherwise absent parent fails to make his monthly child support payment when due. These arrearages may subsequently be tendered, voluntarily, by the absent parent in a lump sum. More com-

## B. Question on Appeal

All parties agree that under Section 602(a)(28) a state must return to the AFDC recipient all child support payments for current obligations received to the extent that such obligations would not affect eligibility for the AFDC program. Thus, as long as a child support collection reflects the current month's entitlement and does not eliminate the budget deficit, when added to monthly income, the AFDC family receives the entire sum from the state by operation of the 1975 amendments as it previously had received the benefits directly from the absent parent.[11]

The point of disagreement lies with what treatment is to be accorded any *excess* support obligations received in any given month as a result of arrearage collection or mere overpayment. Mississippi's practice, on appeal here, has been to retain all child support collected in a given month in excess of the monthly obligation. The govern-

ment-appellants urge the propriety of that practice, while the appellee-class of AFDC recipients contends that Mississippi's practice is contrary to the statutory intent.

A hypothetical case provides the clearest explanation of the parties' divergent positions, as well as the operation of the statutory provisions at issue. Assume a Mississippi family with a $250 standard of need, a maximum statutory benefit of $60, no monthly income, but a monthly child support entitlement of $100. Assume, further that a lump sum child support payment of $600 is collected, covering the current month as well as the prior five months' arrearages. Prior to the 1975 amendments, the AFDC recipient would receive the arrearages directly and would have been able to fill the "gap" between the $60 AFDC payment and the $250 standard of need with child support from arrearage as well as current payments, thus meeting the standard of need.[12] After the 1975 amendments, without consideration of Section

monly, however, these arrearages are only collected upon court order enforcing the child support entitlement. These orders usually cover many months' arrearages.

Payment of more child support than is actually owed is a rare occurrence. This would occur whenever the absent parent, for whatever personal reason, decided to provide more than his legal obligation in child support.

The parties' divergent constructions of the statute would similarly reach both the arrearage and overpayment situations. Since, however, the latter occurrence is uncommon, we follow the parties' focus upon the arrearage situation in our discussion.

11. For example, assume a Mississippi AFDC family of four with no earnings, a $200 monthly standard of need, and a $50 child support payment due and received in a given month. Recall that Mississippi limits AFDC payments, at the time of the dispute here, to the lesser of 40% of the "budget deficit" or the family maximum grant which, for a family of four, was $60. Without considering child support, that family's AFDC entitlement would be limited to the $60 prescribed grant, as the lesser alternative as 40% of the $200 budget deficit, *i.e.* $80, is greater. If child support of $50 were included as disposable income, as it was prior to 1975, the budget deficit would be $150 ($200 less the $50 received). This family would still have received $60 under the Mississippi AFDC plan—since 40% of the $150 deficit is $60, the same as the family maximum. Since the 1975

amendment, under Section 602(a)(28), the $50 child support payment must be added to the $60 AFDC grant. This is so because consideration of the $50 child support due and collected "would not have caused a reduction in the amount of aid otherwise payable to such family" in Mississippi prior to the 1975 amendments. As a result, the Mississippi family is in the same position after the 1975 amendments— with $110 in hand—as before. The parties agree that the legislative intent behind the above application of Section 602(a)(28) was to guarantee a greater percentage of "budget deficit" recoupment for AFDC recipients in gap states such as Mississippi which has a percentage-limited benefit schedule. None of this typical application of the law is at issue.

12. At that time, child support was not assigned to the state and sums received in excess of the standard of need were kept by the AFDC family. These sums should have been considered "countable income." Apparently, Mississippi practice had, erroneously, permitted AFDC families receiving lump sum collections in excess of the standard of need to remain on AFDC, provided the collection was under $1,500, and to treat that collection as a "reserve." Relying upon this prior practice, appellees had originally argued that Section 602(a)(28) required disbursement of all support monies collected, without regard to the standard of need. This argument was rejected in the court below, and dropped on appeal.

602(a)(28), the AFDC recipient would receive only $40 of the current child support entitlement as, pursuant to Section 657(b)(1), the remaining $60 would reimburse the state and federal governments for their financing of the $60 AFDC grant; thus, the AFDC recipient would be left with only $100—$60 AFDC benefit plus $40 child support—and the $500 arrearage payment would be retained by the state in reimbursement for past state and federal AFDC payments, 42 U.S.C. § 657(b)(3). If Section 602(a)(28) were construed in the manner urged by appellants and practiced by Mississippi the AFDC recipient would receive $160—the $60 family maximum grant plus the $100 current monthly obligation. The $500 arrearage would be retained by the state, although only $60 of it would be reimbursement for that month's AFDC payments.[13]

By contrast, when the construction adopted by the district court and argued by appellees is applied, the same AFDC recipient would receive $249—the $60 family maximum grant plus $189 of the collected child support; the redistribution of child support would thus be made without reference to the current or excess nature of the collected monies, but would be limited to a total of $249 so as to maintain AFDC eligibility. The remaining collections, $411, would be retained by the state although, once again, $60 of this amount would be considered reimbursement for that month's payments. It should be noted that in comparing these two constructions, the government's construction would leave our AFDC family better off than it would have been without that amendment—$160 versus $100—but not nearly in the same position as it would have been prior to 1975.[14] The construction adopted by the district court, by contrast, maintains the AFDC "gap" state recipient

in the same situation as pre-1975. The recipient receives the full $250 standard of need level, less one dollar to maintain eligibility.

The government-appellants argue that Section 602(a)(28) should be read in light of its legislative history and together with Section 657(b) to give as much encouragement as possible to states to enforce child support obligations. The encouragement comes from permitting states to retain all child support collected in *excess* of the collection month's obligations. This is the interpretation of the Department of Health and Human Services. Appellants argue: 1) Section 602(a)(28) limits state retention only to child support owed for "any *particular* month"; 2) the rejected House version, H.R. 8598, did not contain the word "particular", and hence the Senate's addition of this word before enactment demonstrates an intent that excess payments could be retained consistent with Section 657(b); 3) the basic purpose of Section 657(b) to shift receipt of child support payments to the states would be frustrated if excess support obligations were accorded the same treatment as current obligations; and 4) the interpretations of HHS to this effect should be given great deference, as that department is charged with interpreting and administering the welfare statute.

Appellees argue, by contrast, that Congress did not intend by Section 602(a)(28) to treat excess collected obligations any different from those support obligations due and collected in any given month. *All* child support *"collected"* in any particular month must be returned to an AFDC recipient, whether in excess of that month's obligation or not, to the extent that such monies, added to countable income, would not render the recipient ineligible for the AFDC program. Appellees' argument may be

---

**13.** At the time of the suit, Mississippi practice was to retain any excess of the child support over the past AFDC payments as "security" against future non-payment by the absent parent. The federal appellant, HHS, upon learning of this practice at a preliminary injunction hearing in the court below, stated that these sums, after total reimbursement to the state, should be paid to the family. Chief Judge

Keady enjoined this "future payment" process. This ruling was not appealed, but in construing the statute's application, we note that we can perceive nothing in the statute which might sanction Mississippi's practice.

**14.** *See* the discussion at note 12 *supra.*

summarized thus: 1) Section 602(a)(28) specifically covers all child support *"collected,"* not merely owed, in "any particular month"; 2) the Senate addition of the word "particular" to the House proposal was merely a technical, not a substantive, change; 3) that Section 657(b) was intended to be modified in gap states such as Mississippi by the remedial Section 602(a)(28); 4) the interpretative ruling of HHS, which is not a rule developed through the formal rule-making process, is not entitled to great deference; and 5) the HHS interpretation would have harsh effects upon the AFDC recipient, inconsistent with the purpose of the remedial legislation.

The district court agreed with the position of the AFDC recipients, as we state it above.[15] Chief Judge Keady held that Mississippi's retention of excess contributions was contrary to the result intended by Section 602(a)(28), *i.e.* that in gap states, such as Mississippi, the assignment of child support obligations pursuant to the 1975 amendments should not leave AFDC recipients in a worse financial plight than they were prior to the amendments. Thus, the district court held that excess collected obligations were to be returned to AFDC recipients along with current obligations, to the extent that such sums would not render a recipient ineligible for aid in any given month. Simply stated, this meant that no collected child support obligations could be retained until the AFDC recipient's standard of need, less one dollar to maintain eligibility, had been met for that given month.[16] We agree with the district court's conclusion. A fair reading of the 1975 amendments and their legislative history leads to this interpretation. When consideration is also given to the practical consequences and potential ramifications of this interpretation, as contrasted with that suggested by the government, it is clear that only the interpretation placed on Section 602(a)(28) by the district court reaches fair and reasonable results consistent with the discernible congressional intent.

## C. Analysis: Legislative Intent

### 1. Statutory Language

■ If sufficiently clear in its context, the language selected by Congress must be given effect [17] unless the result thereby reached is unequivocally contrary to congressional intent or statutory policy.[18] We begin our analysis with an examination of the statutory language itself. The specific provision at issue, Section 602(a)(28),[19] requires all state AFDC plans to supplement family aid with

> any portion of the *amounts collected in any particular month as child support . . .*

**15.** Originally, in the court below, appellees had taken the more extreme position that the government could not retain excess support payments under any circumstances. This argument was not made on appeal.

**16.** Mississippi practice had also sanctioned attorney fee retention, for enforcing the assigned child support obligations, upon collection and before return of *any* child support-due or excess—pursuant to Section 602(a)(28). This priority could operate to deprive AFDC recipients of funds to which they would otherwise be entitled. The district court enjoined this practice, ruling that Mississippi could not permit its attorneys to retain a fee from any enforced child support obligations until the "standard of need" for AFDC eligibility had been met. Apparently, the government does not take issue with this ruling on appeal. We therefore only need to state, for clarification, that the district court's ruling was proper and consistent with the conclusions we reach.

**17.** See *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 200–01, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976); *Louisiana Credit Union League v. United States,* 693 F.2d 525, 541 (5th Cir.1982).

**18.** Thus, the "actual language must be heeded if it is reasonably consistent with the purpose of the statute." *Louisiana Credit Union League v. United States,* 693 F.2d 525, 541 (5th Cir. 1982). See *In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978); *United States v. Campos-Serrano,* 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971); *Johnson v. Department of Treasury,* 700 F.2d 971, 974 (5th Cir. 1983); *Oliver v. United States Postal Service,* 696 F.2d 1129, 1131 (5th Cir.1983); *Allen v. Pierce,* 689 F.2d 593, 596 (5th Cir.1982).

**19.** 42 U.S.C. § 602(a)(28). This subsection is set out in full in note 9 *supra.*

which [prior to the 1975 amendments] . . . would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family. . . . (emphasis added).

This provision in terms requires the state to return to AFDC recipients a certain portion of the child support obligations it receives, through operation of the 1975 IV–D program, so it modifies Section 657(b) in its provision for state retention of enforced obligations. Exactly what portion is exempted from Section 657(b)'s reach is at issue.

▉ The focus of the controversy is the phrase "collected in any particular month." Contrary to the government's argument, we have no difficulty with the plain meaning of this clear, concise, phrase.[20] Section 602(a)(28) refers to the child support obligations *collected* in any particular month. It does not employ such terms as "due" or "owed" which the government would have us read into the statute as modifiers. Collected means collected.[21] Had Congress wished the statute to have a modified reach, so as to distinguish between due and excess contributions, it could easily have stated this distinction.[22] Yet it did not. It chose instead to require the states to disburse to the AFDC family *any collected* child support obligations, to the extent that such amounts would not affect AFDC eligibility in any given month.[23]

The government-appellants argue that the phrase "any *particular* month" limits disbursement consideration to those obligations which become due in the month in which they are collected. That is not what the statute says. It says "collected" in any particular month, not "becoming due" in any particular month. The provision directs the states to consider, in any given month in which a collection is made, that month's collections against that month's AFDC financial eligibility figures without

---

**20.** Brevity does not necessarily imply ambiguity. Clear statutory terms, however succinct, should be read to mean what they say. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171 (1981).

**21.** A basic canon of statutory construction is that words should be interpreted as taking their ordinary and plain meaning. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1980). We must assume that Congress used the words of the statute as they are commonly and ordinarily understood. *United States v. Porter,* 591 F.2d 1048, 1053 (5th Cir.1979). A statute should ordinarily be interpreted according to its plain language, unless a clear contrary legislative intention is shown. *United States v. Apfelbaum,* 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980). *United States v. Yeatts,* 639 F.2d 1186, 1189 (5th Cir.), *cert. denied,* 452 U.S. 964, 101 S.Ct. 3115, 69 L.Ed.2d 976 (1981).

**22.** Drawing an inference of an intent to exclude a particular result from the failure to expressly proscribe that result is the essence of the common law maxim "expressio unius est exclusio alterius," often applied as an aid in statutory construction. The maxim embodies a sensible insight into the customary manner in which language is used to communi-cate ideas. Simply stated, "[i]t expresses the learning of common experience that generally when people say one thing they do not mean something else." 2A C. Sands, *Statutes and Statutory Construction* § 47.24 (4th ed. 1973). . . .

*Duke v. University of Texas,* 663 F.2d 522, 526 (5th Cir.1981) (citations omitted).

**23.** Section 602(a)(28) limits state obligation to return child support payments to the AFDC recipients to that portion which, prior to the 1975 amendments, "would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family." The district court, considering various hypothetical financial scenarios, concluded that this limitation meant that child support "collected in any particular month" must be returned to the extent that AFDC eligibility would not be affected, *i.e.* one dollar less than the standard of need. The parties do not question the district court's interpretation of this limitation, but merely the type of collected child support which must be considered in reaching this statutory ceiling. Given this area of agreement, together with the facial reasonableness of the court's construction, we need not undertake an in depth linguistic and mathematical review of the court's interpretation. Rather, the propriety of this interpretation must be gauged upon consideration of whether our overall construction of Section 602(a)(28) comports with the legislative intent and objectives behind the 1975 amendments.

reference to, for example, past or future budget deficits.[24] Without such clarification of the terms of the calculation, the section would be ambiguous in application.[25]

### 2. *Legislative History*

Appellants contend that the section's legislative history supports their position. They emphasize that the original House version of Section 602(a)(28) did not contain the word "particular," but merely provided for amounts "collected in any month as child support."[26] The addition of the word "particular," in the subsequently enacted Senate version, they argue, evidences a congressional intent that collections in excess of the current month's obligations need not be considered. We fail to see the logic, let alone the proffered congressional clarity, in this legislative history. We have been referred to no legislative history whatsoever concerning the Senate insertion of the word "particular," nor have we found any such history. The addition of the term "particular" in the hastily enacted Senate version[27] —where the House version had said "any month"—does not appear to affect the meaning of the section, other than for technical purposes.[28]

Our construction of Section 602(a)(28) is harmonious with the statutory framework in which it appears. Nothing in the text of the Social Security Act, specifically the 1975 amendments, dissuades us. In so concluding, we reject appellant's argument that the textual distinctions made in another new section of the law, 42 U.S.C. § 657(b),[29] must be read into Section 602(a)(28). Section 657(b), part of the new Child Support and Establishment of Paternity Act (or IV–D program), sets out a hierarchy of ways in which the child support obligations assigned to the state will be used. First, it specifies that a periodic collection of monthly support obligations may be retained by the state as reimbursement for its assistance to the AFDC recipient during that period,[30] with appropriate reimbursement, in turn, to the federal government to the extent of its participation in the financing. Second, once the state is reimbursed for that period, the excess amounts are to be returned to the AFDC family, if and only if, the amounts *are not in excess* of the

---

**24.** For example, suppose that a $150 collection is realized in November, which covers the absent parent's overdue child support obligations of September and October, as well as that due in November. Although the AFDC recipient's standard of need may not have been met in the prior two months, for which child support was subsequently recovered, the state is not required to distribute any collected funds towards these past deficits. Only the collection month's figures are relevant.

**25.** Otherwise, a state would not know whether, for example, past months' benefits need be recalculated when an overdue obligation were finally collected. *See* note 24 *supra*.

**26.** H.R. 8598, 94th Cong., 1st Sess. (1975).

**27.** As discussed, *infra*, § 602(a)(28) was rather hastily drafted when Congress realized that the child support provisions in the previously enacted IV–D program would have a different, and detrimental, effect in those states such as Mississippi which do not provide dollar-for-dollar budget deficit AFDC benefits.

**28.** The parties cite, and our research reveals, no legislative explanation of this minor Senate addition to the House version. Further, we note that the same minor addition of the word "particular" was made in a parenthetical reference later within § 602(a)(28) to the "particular" pre-amendment month to be used to determine whether benefits would be reduced by considering additional child support. *See* note 9 *supra*. Thus, we can only reasonably conclude that the addition was made for non-substantive, clarification purposes.

**29.** This provision is set out in footnote 8 *supra*.

**30.** This provision refers to periodic collections and periods of AFDC benefits, in contrast to monthly support obligations, as some states determine AFDC payments and eligibility on a less frequent than monthly basis. Thus, for those states on a quarterly basis, the relevant period of three months would be the time period over which AFDC payments plus the return to AFDC recipients of child support payments would be calculated. In those states with monthly AFDC consideration, such as Mississippi, the relevant period would be any given month. *Cf. Gregory v. Stanton*, No. IP 78–66–C (S.D.Ind. Dec. 17, 1982) (Indiana pre-1975 quarterly calculation of AFDC benefits, is not required to be continued by § 602(a)(28); Indiana can change to a monthly calculation period).

child support due for that period. Finally, if such amounts *are in excess* of that which is owed for the period in question, the excess first goes to the state as reimbursement for prior periods' AFDC payments (with appropriate federal government reimbursement) and then, if the excess satisfies all prior government AFDC payments, the remainder is distributed to the AFDC recipient. Section 657(b) thus distinguishes between currently owed and excess child support in its distribution scheme.

■ We find no reason, however, to believe that this other section's requirements were meant to be superimposed upon Section 602(a)(28). First, there is no indication to this effect in the text of the statute. Section 602(a)(28), unlike Section 657(b), is plain and uncategorical in its direction for distribution of "amounts collected in any particular month." Had Congress desired to carry over the distinctions expressed in Section 657(b) it could easily have done so. Second, the reference within Section 602(a)(28) to Section 657 reasonably evidences a congressional intent that the latter sections' distinctions were *not* to be carried over. Section 602(a)(28) generically identifies the child support "retained by the State under section 657" as the object of redistribution to AFDC families. It does not distinguish between due or excess collections, although, once again, Congress could easily have done so by simply adding a limiting subsection to its Section 657 reference.[31] Finally, we find nothing textually inconsistent with the differing interpretations we place on these sections. Section 657 effects a distribution scheme generally applicable to the states. All states, both those which provide dollar-for-dollar budget deficit benefits and the gap states, are subject to this distribution scheme. Only the gap states, those which do not provide full budget deficit assistance, are affected also by Section 602(a)(28). Even in the gap states, once reimbursement is made for the AFDC eligibility period in which a child support obligation is collected, pursuant to Section 602(a)(28), the distribution scheme of Section 657(b) takes over. Thus, our interpretation neither creates an internal statutory conflict nor renders Section 657(b) inoperative.[32]

The legislative history of the 1975 amendments reinforces our interpretation of Section 602(a)(28). The IV–D program was conceived upon congressional realization that the problem of welfare dependency—including the steadily rising cost of the AFDC program—was caused, in part, by absent parents who did not pay adequate child support.[33] Congress therefore sought to enact legislation which would encourage the collection of these hitherto unenforced child support obligations by the state. To this end, the IV–D program mandated that paternity and child support enforcement services be provided by the states to all AFDC recipients. 42 U.S.C. § 654(4). Further, among other things, the Act made it permissible for the states to require, as a prerequisite to AFDC eligibility, the assignment of support obligations to the state, 42 U.S.C. § 602(a)(26), and provided concomitant incentives to the states to enforce these assigned obligations. Among these incentives is that embodied in Section 657(b), *i.e.* permitting the states to retain some of the collected funds in reimbursement for AFDC payments.

**31.** "There is . . . a well settled rule of statutory construction that where different language is used in the same connection in different parts of a statute it is presumed that the Legislature intended a different meaning and effect."
*Russell v. Law Enforcement Assistance Administration,* 637 F.2d 354, 356 (5th Cir.1981) (quoting *Morgan v. Jewell Construction Co.,* 230 Mo.App. 425, 91 S.W.2d 638, 640 (1936)).

**32.** "It is well established that a statute should be construed so that each of its provisions is given its full effect; interpretations which render parts of a statute inoperative or superfluous are to be avoided." *Duke v. University of Texas,* 663 F.2d 522, 526 (5th Cir.1981) (citing *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973)).

**33.** *See* S.Rep. No. 93–1356, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News, 8133, 8145–46.

After passage of the amendments in 1975, Congress became concerned with the viability of several provisions of the Act, and accordingly decided to undertake further study of the law. The effective date of the Act was thus moved ahead one month to August 1, 1975.[34] One of the problems occasioning the delay, was a congressional realization that "because of maximums in a few States in the amount of aid payable, certain recipients having child support income would lose some disposable income when [the IV–D program] was implemented."[35]

The House acted first, by proposing the addition of the new subsection (a)(28) to Section 602.[36] The House Committee report, in explanation of this provision, stated:

> SECTION 2. PROTECTION AGAINST DECREASE IN GRANTS BECAUSE OF PAYMENT OF SUPPORT DIRECTLY TO THE STATE
>
> [A]ny child support collected and retained by the State pursuant to its child support plan under part D of title IV which would not have caused a reduction in aid had the child support been paid directly to the family will be added to the amount of aid otherwise payable to the family. This

new requirement would affect States which provide aid to families with dependent children at a rate which is less than their needs standard, but permit child support payments to fill the gap between the standard and the actual payment level.

## GENERAL DISCUSSION OF THE PROVISIONS OF THE BILL

Some States have been unable to provide payments as large as the amounts that are recognized to be needed by families. This frequently results in a gap which the State permits to be filled by private income—in this instance, child support. The transfer of the support payments to a State or local agency obviously reduces the private income of a family and in those states would almost certainly result in the loss of some or all of the amount of child support to the family. Your committee's bill accordingly provides that where the assignment of child support to the State results in reduction of the family's income that the State shall increase its assistance payment to the family to compensate this loss.[37]

The discussion on the House floor was equally specific and consistent with the committee report.[38] The House passed H.R.

---

34. This was done on June 30, 1975, by Pub.L. No. 94–46, § 2, 89 Stat. 245 (1975).

35. United States Senate, Committee on Finance, Child Support Data and Materials, 94th Cong., 1st Sess. 4–5 (Nov. 10, 1975). "This delay of 1 month was to provide time for the Finance Committee and the Congress to amend the child support provisions in a manner which would take care of the problem concerning both the States [in their lack of statutory authority or statutory barriers] and the recipients involved." Id. at 5.

36. The House proposal was enacted verbatim as 42 U.S.C. § 602(a)(28), except for the Senate's addition of the word "particular" which, as discussed earlier, we find not to be substantive in nature. See the discussion at notes 24–28 supra.

37. H.R.Rep. 94–368, Child Support Program Improvements, House Ways and Means Committee, 94th Cong., 1st Sess. 5, 10 (July 17, 1975).

38. As Representative Corman said: "This legislation is needed prior to August 1 because of

serious problems regarding implementation of the program which would result if the law goes into effect on that date without amendment," including:

> [One] problem found by the committee was that after August 1, many families in 12 States plus Puerto Rico will suffer reduction in their total income. Those 12 States are: Arizona, Arkansas, Georgia, Indiana, Maine, Mississippi, Missouri, Nebraska, South Carolina, Tennessee, Virginia, and Wyoming. Some States have been unable to provide AFDC payments as large as the amounts that are recognized to be needed by families.
>
> This frequently results in a gap which the State permits to be filled by private income, in this instance, child support from the absent father. Since under the new child support program the support payments are made directly to the State or local welfare agency instead of to the family, there is a resulting reduction in the family's total income. Therefore, the committee's bill would require that the State shall increase its assistance payments to the family to compensate for this loss.

8598 the same day of the debate, July 21, 1975,[39] and the bill proceeded to the Senate.

On August 1, 1975, the Senate brought up for debate these same needed changes in the IV–D program. The proposed Senate bill varied in certain respects from that of the House.[40] Its version of Section 602(a)(28), was identical to that passed by the House, except for the addition of the word "particular."[41] Senator Long explained the purpose of this section:

> The amendment as modified would permit States which now allow recipients to keep a portion of the child support payments they receive, to continue to do so *in order to prevent a reduction in income by recipients.*

121 Cong.Rec. S26754 (daily ed. Aug. 1, 1975) (emphasis added). This purpose is the same as that expressed by the House in its committee report accompanying its virtually identical version of Section 602(a)(28).[42] The Senate passed these amendments after debate by voice vote, the House ratified the Senate's action, and the bill was signed into law on August 9, 1975. Act of August 9, 1975, Pub.L. No. 94–88, 89 Stat. 433 (1975).

We find that the legislative history of Section 602(a)(28), as set out above, squarely supports our interpretation of that provision. Clearly, Congress intended Section 602(a)(28) to alleviate the hardship wrought upon AFDC recipients by the previously enacted, soon to become effective, IV–D program. Congress realized that in those states, including Mississippi, whose AFDC benefit schedules left a "gap" between recipients' resources and their standard of need, the assignment and retention of child support by these states would leave their AFDC recipients financially worse off than before the Act's passage. Congress, in enacting the IV–D program, had sought to ameliorate the nation's welfare problem by enforcing obligations owed by errant child support obligors, not by decreasing the actual resources available to AFDC families. Upon this realization, Congress hastily passed a remedial provision, which became

---

121 Cong.Rec. H23696 (daily ed. July 21, 1975) (remarks of Rep. Corman).

Similarly, Representative Vander Jagt discussed the bill as allowing AFDC families to continue to retain child support payments up to the State needs level:

> Section 2 is designed to correct a situation in which some AFDC recipients would receive less income because of the child support provisions. In some States, AFDC payments are less than the State's standard needs levels. Many AFDC recipients in these States have been allowed to receive and retain child support payments to the extent that they make up the difference between the welfare payment and the State needs level. But under the new law, recipients must assign their child support rights to the State, which would return only part of the money to the AFDC family. The bill before us would allow these families to continue to retain child support payments up to the State needs level.

121 Cong.Rec. H23697 (daily ed. July 21, 1975) (remarks of Rep. Vander Jagt). He emphasized the time problem by stating that "H.R. 8598 comprises a series of amendments aimed at alleviating these problems, and because the effective date is less than 2 weeks away, congressional action on the measure should be completed as soon as possible." *Ibid.*

**39.** 121 Cong.Rec. H23699 (daily ed. July 21, 1975).

**40.** The debate indicated that although the Senate did not vote upon the House bill as passed, it was working with the House and moving in the most expeditious manner possible to implement the needed amendments. As Senator Long stated on the floor:

> I have discussed the committee provisions with the chairman of the Ways and Means Committee and with the chairman of that committee's Subcommittee on Public Assistance. They have indicated their willingness to accept the Finance Committee amendment if certain changes are made. The amendment I am offering incorporates these changes. Let me now describe the provisions of the amendment.

121 Cong.Rec. S26754 (daily ed. Aug. 1, 1975) (remarks of Sen. Long).

The Senate Finance Committee actually proposed its provisions, similar to those of the House, as an amendment to a pending noncontroversial bill involving certain tariffs, H.R. 7710, 94th Cong., 1st Sess. (1975), to expedite passage.

**41.** *See* the discussion at notes 24–28 *supra.*

**42.** *See* note 38 *supra.*

effective simultaneous with the IV–D program.[43]

■ "As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve."[44] Thus, in order for this gleaned intent to be given effect, Section 602(a)(28) must be construed without distinction between the current and excess child support obligations composing any particular collection. Prior to the 1975 amendments, the "gap" states permitted their AFDC recipients to close the budget gap with any child support received, without consideration of the "current" or "excess" nature of such payments. The AFDC recipients enforced their own child support obligations. If they were collected, the recipients could hope to approach the standard of need. In order for Section 602(a)(28) to have its intended effect, therefore, it must similarly be blind to "current" versus "excess" distinctions. Were only current obligations subject to Section 602(a)(28), as argued by appellants, AFDC recipients would remain worse off after the 1975 amendments than before, although to a lesser extent than had Section 602(a)(28) not been enacted. The hypothetical case, considered *supra*,[45] provides the clearest proof of this conclusion.[46]

Appellants raise several arguments, in an effort to discredit the evidence of congressional intent relied upon here. These arguments are unpersuasive. First, appellants point out that nowhere in its report, or debate, did the House explicate that Section 602(a)(28) applied to arrearages as well as current months' support obligations. We do not take issue with this observation. Rather, we add, neither did the House sources give an indication that its provision was limited to current obligations, as the appellants would have us infer. In the immediate case, Congress generically referred to "child support" without defining nor excluding its possible components. The presumption must arise, therefore, that Congress did not intend any differentiation. Further, the unequivocal effects sought to be achieved by this proposal, as discussed above, could only have been obtained through inclusion of all child support within the proposed Section 602(a)(28). Thus, appellants' first argument has no merit.

Second, appellants argue that since the House version was not enacted into law and the subsequently-passed Senate amendment varied from that of the House, indicia of congressional intent in House legislative history deserve little weight. As we conclude above,[47] the Senate amendment was substantively identical to that of the House. The only relevant difference between the two versions, was in the Senate's addition of the word "particular." This technical, nonsubstantive addition, itself lacking any legislative history, does not render the indicia of House intent any less weighty.[48]

---

**43.** These contemporaneous constructions of the subsequently enacted Section 602(a)(28) are weighty authority in construing the section's intended effect. *See Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979); *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 n. 6 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980).

**44.** *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).

**45.** This hypothetical is discussed at notes 12–14 *supra*.

**46.** We find that Section 602(a)(28) is clearly limited to disbursements of child support up to the point of ineligibility. After that point, § 657(b)'s government reimbursement provisions take over. Although Congress broadly stated its intent to leave AFDC recipients financially unaffected by the 1975 amendments, these statements must be construed in the limited context in which they were offered, *i.e.* in addressing the substandard of need situation of families in "gap" states. In any event, the explicit language of § 602(a)(28) makes clear that the section is limited to child support disbursements up to the point that AFDC eligibility would be affected.

**47.** *See* the discussion at notes 24–28 and 40–42 *supra*.

**48.** Nor do we attach any significance to the fact that the Senate elected to propose its own version of § 602(a)(28) rather than merely passing an amendment to the House version. The Senate, hastily seeking to remedy the perceived deficiencies in the IV–D program on the date it was to become effective, made a tactical

■ Finally, appellants argue that a post-enactment committee statement indicates a congressional intent to limit Section 602(a)(28) to current obligations.[49] We find this statement ambiguous with regard to congressional intent. Moreover, it is well accepted that even explicit post-enactment, retrospective, statements of intent are to be looked upon with caution.[50] Thus, in the immediate case, where a fairly clear contemporaneous expression of congressional intent is discernible, we do not accept as significant an ambiguous post-enactment declaration of intent.

### 3. *Practical Impact Upon Policy*

■ Consideration of the ramifications of our holding, as well as those of the rejected construction, lends further strength to our conclusion. A construction which leads to impractical or harsh results is to be avoided.[51] The practical effects of any interpretation must be assessed with an eye towards the mischief Congress sought to remedy.

Appellants' objections are essentially two-fold: 1) that administration of the statute as interpreted here would be inefficient, leading to computation difficulties and errors; and 2) that the interpretation would cause a reduction in the reimbursement funds available to the state and federal governments. The first objection is readily dismissed. We cannot perceive how the computations required here are any more difficult, or prone to error, than those which need to be made under appellant's proffered construction. In either case, Section 602(a)(28) child support calculations must be made and then Section 657(b) applied. The only difference, in applying Section 602(a)(28), is whether to consider the lump sum child support collected (our construction) or to subtract out and consider only the child support due that month (appellants' construction) in determining disbursements up to the point of eligibility. If anything, appellants' position by adding a step to the calculations is more prone to error.[52] In any event, this factor could not offset the overriding congressional intent

election to attach its own version as a rider to a non-controversial tariff bill. *See* note 40 *supra.*

**49.** [State CSE plans must p]rovide for distribution of funds as required by section 457 [42 U.S.C. § 657] unless the amount of the current monthly support payment collected is equal to or greater than the AFDC assistance payment or the court order for support, whichever is larger (secs. 454(5) and (11) [42 U.S.C. §§ 654(5) and (11) ] ). An exception to the distribution formula in section 457 permits the continuation of existing practice by a State concerning child support payments (but only to the exact extent that this practice was authorized by the State plan for July 1975) by providing that such State, in determining the amount of aid to which a family is entitled for a particular month, will add to the amount of aid otherwise payable to the family, the amount of child support collected as payment on the required support obligation for the month in which the support was collected and retained by the State pursuant to its child support plan under part D of title IV which would not have caused a reduction in aid for AFDC for the month of July 1975 had the child support been paid directly to the family.
United States Senate, Committee on Finance, Child Support Data and Materials, 94th Cong., 1st Sess. 33–34 (Nov. 10, 1975).

**50.** The retroactive wisdom ... of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history.... [M]ortals are not free from the temptation to endow yesterday with the wisdom found today. What happened after a statute was enacted may be history and it may come from members of the Congress, but it is not part of the legislative history of the original enactment.
*Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1080 (5th Cir.), *cert. denied,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980).

**51.** *See Griffin v. Oceanic Contractors, Inc.,* —— U.S. ——, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982); *United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *Graddick v. Tennessee Valley Authority,* 636 F.2d 1061, 1066 (5th Cir.), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981). *See also American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982).

**52.** To our minds, the three-tiered computation-reimbursement mechanism of § 657(b) is the most confusing, and much more apt to occasion error than the computations required by § 602(a)(28), however construed.

and other practical considerations which dictate a finding to the contrary. Hence, we reject this initial concern.

Appellants' second concern that government reimbursement is in some instances diminished is similarly unpersuasive. Clearly, our holding today effects a reduction in the reimbursement available to states. However, this effect is circumscribed. Only "gap" states, which do not provide full budget deficit AFDC benefits, are affected by Section 602(a)(28) and, hence, our holding. Further, appellants' complaint of decreased reimbursement relates only to collections made in *excess* of monthly obligations, primarily arrearage payments. Diligent states, fulfilling the congressional goal of rigorous enforcement of child support obligations, will be the least affected. In these states, collections will reflect more current, rather than arrearage, obligations. By contrast, those less diligent states, only occasionally enforcing obligations, will be most affected. Finally, the "loss" of reimbursement monies is limited to a meager amount in any event since only enough of the child support money is returned to the family to bring it up to the standard of need level which is not very high.[53] The rest still belongs to the state. When the current month's child support and AFDC benefits are taken into account, the "gap" filled by excess collections is quite limited. Yet, however limited, these funds are of great significance to the below-subsistence level AFDC families. The limited effect of our holding on the states, to the benefit of AFDC recipients, is wholly consistent with the congressional policy. AFDC families are not enriched. They are only brought up to the minimum level of need even in the month a substantial arrearage is paid.

Our holding also effectuates the IV–D program's goal of enforcing child support obligations. Appellants' proffered construction provides an incentive for state delay in collecting the obligations which, because of assignment, the state alone may enforce. The longer the states wait, under the appellants' interpretation, the more money the states may retain as current months' obligations become arrearages. And the arrearages would not be redistributed to any substantial extent under appellants' position. By contrast, the construction we adopt decreases the incentive for delay. Arrearages, as well as current obligations, are considered in filling the needs standard. Appellants argue, however, that the decrease in reimbursement to the state removes the states' incentive to enforce obligations. This contention is not persuasive because the states still retain a significant portion of the collected funds, under Section 657(b), once Section 602(a)(28) requirements are satisfied. The most significant incentive, in any event, is the basic incentive created by Congress as part of the IV–D program: rigorous enforcement of child support obligations will decrease the number of people on the AFDC rolls. We conclude that the interpretation we adopt today furthers the congressional policy underlying the enactment of the IV–D program.

### 4. Agency Construction

In reaching our conclusion, we have given careful consideration to the fact that HHS, the agency charged with administering the statute at issue, has reached a different interpretation. An agency interpretation made pursuant to a congressional delegation of authority is entitled to substantial deference.[54] What deference is due in a given case, however, will vary in accordance with a number of factors. These include: the consistency of the interpretation and the length of adherence to it, undisturbed by Congress; the explicitness of the congressional grant of authority to the

---

53. For example, at the time of suit, the monthly standard of need level for a family of four in Mississippi was $252.

54. *See, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Florida Power & Light Co. v. FERC,* 660 F.2d 668 (5th Cir.1981), *cert. denied sub nom. Fort Pierce Utilities Authority v. FERC,* —— U.S. ——, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

agency, with greater deference in cases of more specific delegation; and the degree of agency expertise necessarily drawn upon in reaching its interpretation.[55] In the immediate case, we find a consistent interpretation.[56] It is short-lived, however, and without evidence of congressional acquiescence.[57] While the agency has a rather general statutory grant of authority to prescribe all rules and regulations necessary to the statute's efficient operations [58] the interpretative task does not draw heavily upon the agency's expert knowledge and ability. Evaluation of these factors shows no demand for the highest level of deference.

█ In any event, in this case we find we must rely upon the fundamental principle that deference is not paid to an agency interpretation if it is clearly wrong or unreasonable:

> [D]eference to an agency's interpretation of its statute is limited by the courts' obligation "to honor the clear meaning of the statute, as revealed by its language, purpose and history", *International Brotherhood of Teamsters, Warehousemen & Helpers of America v. Daniel,* 439 U.S. 551, 99 S.Ct. 790, 800 at note 20, 58 L.Ed.2d 808 (1979), and by the requirement that the agency interpretation not be clearly wrong or unreasonable. *Fredericks v. Kreps,* [578 F.2d 555, 561 (5th Cir.1978)].

*Coca-Cola Co. v. Atchison, Topeka & Santa Fe Railway Co.,* 608 F.2d 213, 222 (5th Cir. 1979).[59]

█ We conclude that, in the immediate case, HHS's interpretation is contrary to

---

**55.** *See, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

**56.** By way of its Order of Preliminary Injunction dated August 23, 1977, the district court ordered HHS to issue explicit instructions to Mississippi regarding the distribution of arrearage child support collections under the Social Security Act. On October 5, 1977, and in response to that order, HHS issued such instructions which were rejected, on March 20, 1978, by the court stating that they "totally ignore both the declared purpose as well as the plain wording of [§ 602(a)(28)]." HHS then issued new instructions pursuant to and consistent with the district court's March 20th order. This second set of instructions tracks appellees' position.

Appellees contend that this second set of instructions thereby demonstrates an inconsistency in the department's position, and an admission of sorts by the agency of the propriety of appellees' position. We disagree on both scores. HHS issued these instructions pursuant to court order and contrary to its own view of the statute. The statements, therefore, cannot properly be attributed to the agency as either an inconsistent interpretation or an admission of contrary authority. While we ultimately reject appellants' construction of § 602(a)(28), we do not do so on the above proffered basis.

**57.** We note that the Department's interpretation, by way of instructions to the states, has not gone through the formal rulemaking proce-

dures of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq. Although benefit programs are not covered by the APA, in 1971 HHS (then the Department of Health, Education and Welfare) obligated itself to follow the Act. See 36 Fed.Reg. 2532 (1971).

**58.** 42 U.S.C. § 1302 directs the Secretary of HHS to make such rules and regulations "not inconsistent with this chapter, as may be necessary to the efficient administration of the functions ... charged under this chapter."

**59.** *See Southeastern Community College v. Davis,* 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971); *King v. Smith,* 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968); *Florida Power & Light Co. v. FERC,* 660 F.2d 668, 677 (5th Cir.1981) *cert. denied sub nom. Fort Pierce Utilities Authority v. FERC,* —— U.S. ——, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983); *Columbia Gas Development Corp. v. FERC,* 651 F.2d 1146 (5th Cir.1981). *Cf. Louisiana Chemical Ass'n v. Bingham,* 657 F.2d 777, 779 (5th Cir.1981) (agency's interpretation, although substantial factor in construing a statute, remains only one input in interpretational equation). *Cf. New Jersey v. HHS,* 670 F.2d 1262 (3d Cir.1981) (upholding agency interpretation of another IV–D provision, which was consistent with that gleaned by the court); *Seagraves v. Harris,* 629 F.2d 385 (5th Cir.1980) (where legislative intent was quite ambiguous, on another child support issue arising under the 1975 amendments, deference was given to agency's interpretation).

the plain meaning of the statute, and also to congressional intent and policy considerations. While we as a reviewing court may not merely substitute our interpretation of a statute for that of the agency charged with its administration, neither may we abdicate our function where an agency, in the guise of interpretation, effects a change in statutory intent.[60] In the immediate case the district court and this court are as well versed as the agency in construing congressional intent.[61] We are compelled to conclude that the interpretation of the Department of Health and Human Services is clearly in error.

### D. *Conclusion*

██ In conclusion, we hold that Section 602(a)(28) requires that child support payments, whether current obligations or those in arrears or even in the occasional case those which are overpayments, are to be paid to AFDC families to the maximum extent permitted in the month received while maintaining AFDC eligibility. Payments in excess of that amount in any given month are properly committed to reimbursing the government. Accordingly, we affirm the district court on this issue.

### II. *Cooperative Arrangements*

### A. *Overview and Question on Appeal*

The Child Support and Establishment of Paternity Act mandates the establishment of a "IV–D" unit in each state which will pursue, with attorneys and other personnel, the child support payments assigned to the state under the Act. 42 U.S.C. §§ 651, 652 (1975). Further, "... to assure optimum results under such Program ..." state plans for operating the AFDC program must "*provide for entering into cooperative arrangements with appropriate courts and law enforcement officials ...*" 42 U.S.C. § 654(7) (emphasis added).[62] Federal financial assistance is available for states which enter into these cooperative arrangements in the amount of 70% of the expenses of administering these arrangements, 42 U.S.C. § 655, 45 C.F.R. §§ 304.20, 304.21, and 70% of the cost of "... purchase of child support enforcement services..." 45 C.F.R. § 304.22. When these "cooperative agreements" are established with local political subdivisions or the state government, the attorneys employed by the subdivisions who are successful in obtaining support payments can receive for their employers a 12 percent incentive. 42 U.S.C. § 658(a). This 12 percent incentive comes out of the federal share of the money which constitutes reimbursement for federal payments for past AFDC benefits. 42 U.S.C. § 658(a).

Mississippi has not entered into Section 654(7) cooperative agreements, and therefore does not receive financial assistance under Section 655, and incentive payments to political subdivisions under Section 658.[63]

---

**60.** " '[T]he role of the agencies remains basically to execute legislative policy; they are not more authorized than are the courts to rewrite acts of Congress.' " *Louisiana Chemical Ass'n v. Bingham,* 657 F.2d 777, 779 (5th Cir.1981) (quoting *Talley v. Mathews,* 550 F.2d 911, 919 (4th Cir.1977)).

**61.** *See Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).

**62.** This section, in full, reads:
A state plan for child and spousal support must—
(7) *provide for entering into cooperative arrangements with appropriate courts and law enforcement officials* (A) to assist the agency administering the plan, including the entering into of financial arrangements with

such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;
42 U.S.C. § 654(7) (emphasis added).

**63.** Mississippi relies instead upon state law to compensate County and District Attorneys for enforcing § 602(a)(26) child support assignments to the state. As found by the court below, state law in some cases mandates and in other cases allows attorneys' fees to be paid from the monies recovered, and County Attorneys may receive both their salaries and court-ordered fees.

As indicated *supra,* note 16, at the time of this suit Mississippi had improperly permitted these attorneys' fees to be subtracted from the child support monies collected before AFDC

HHS policy only requires that state plans have provisions for cooperative arrangements, but not that arrangements need actually be made. In the court below, appellees contended that these cooperative agreements were mandated under all circumstances. Appellants argued that the statute only required such arrangements upon a showing that the state was not enforcing support obligations; their position was that Section 654(7), by providing for agreements with "appropriate" courts and law enforcement officials, left the determination of whether agreements were necessary to the discretion of the states, which might elect to forego the federal financial incentives. The district court agreed with appellees' position and ordered that Mississippi must enter into cooperative agreements, and could not exercise any discretion to the contrary.[64]

For the reasons set out in the following discussion, we find that under Section 654(7) the states are not required to reach cooperative agreements with their courts and law enforcement officials. To this extent, we reverse the district court's order. We do find, however, that Section 654(7) requires the states to pave the way for such agreements by enacting enabling legislation and removing any statutory impediments thereto, and also requires the states to make reasonable, good faith attempts to secure cooperative agreements with their courts and officers. Accordingly, we reverse and remand to the district court to enter an order consistent with our determination.

### B. Analysis: Legislative Intent

When the language of Section 654(7) alone is considered, its meaning lacks clarity. Section 654(7) requires that all state AFDC plans "*must provide for entering into cooperative arrangements* with appropriate courts and law enforcement officials." 42 U.S.C. § 654(7) (emphasis added). The controlling issue here is what is required of the states in order to "provide for entering into cooperative arrangements" in compliance with the statute.[65] Four possible meanings are suggested: (1) that the statute requires such agreements to be entered into, as appellees contend and as held by the district court; (2) that the provision requires the states to pass enabling legislation and to remove statutory impediments, so as to permit agreements to be reached; (3) that, in addition to number (2), the states must make all reasonable, good faith attempts to secure agreement; and (4) that the states, as appellants contend, have discretion to determine whether cooperative agreements are necessary "in order to assure optimum results under the program."

recipients would receive any monies to fill the gap between AFDC benefits and their standards of need under § 602(a)(28). The district court properly enjoined this practice.

**64.** The district court's judgment, as amended, provides:

3. That the state public welfare defendants be and they are hereby preliminarily and permanently enjoined to enter into cooperative arrangements with appropriate courts (County Courts, Family Courts, Circuit Courts, and/or Chancery Courts having jurisdiction over paternity actions under Miss. Code Ann. § 93–9–15 et seq.) and law enforcement officials (District Attorneys and/or County Attorneys under Mississippi law) who assist the State Public Welfare Department in meeting its obligations as the agency of the State to establish paternity and enforce child support obligations under 42 U.S.C. § 654(4) and the Secretary of Health

and Human Services is preliminarily and permanently enjoined to accept such cooperative arrangements as part of the State's plan for child support, as provided by 42 U.S.C. § 654(7), and this injunction shall continue in effect until Congress shall provide otherwise.

**65.** Appellants argue that the phrase "*appropriate* courts and law enforcement officials" is operative, and provides states with the discretion to determine whether or not they need agreements based upon the collection results achieved absent such agreements. This argument is specious. As the district court concluded, the word "appropriate" clearly denotes the "relevant" or "proper" court or law enforcement officials with whom to seek agreements, and no more. This plain meaning must be given effect, in the absence of any evidence of congressional intent to accomplish the extraordinary effect which appellants would attach to the language.

On its face, the section seems to *require* that the states *make provision* for these agreements, in accordance with the second suggested reading of the statute. It requires that the state plans *must provide for* entering into cooperative arrangements; it is compulsory, contrary to the appellants' contention of discretion, yet only compels that provisions for effecting agreements be made, and not that the agreements must be entered into, contrary to appellees' contention.

An additional gloss to the provision's meaning, however, is derived upon consideration of the remainder of Section 654. Subsection (7) appears as only one of many requirements placed on state AFDC plans. The section begins "A state plan for child and spousal support must" and then lists each requirement beginning, in almost every case, with "provide for" or "provide that."[66] Further, the state plan requirements for AFDC eligibility itself, 42 U.S.C. § 602, contains this same "must provide for" language. These provisions have been deemed mandatory,[67] requiring state fulfillment of the *obligations* therein imposed, and not merely as requiring the facsimile of compliance by a written, unsatisfied, plan provision.

If this "provide for" language were not intended to have an obligatory effect, then many of the statute's essential features would become discretionary. There is no indication that this result was intended by Congress in its selection of the prefatory language "provide for" throughout the statute. The state plan must provide for entering agreements. There still remains the issue of whether it must make them.

The legislative history of this provision does not show a clear indication of congressional intent. Originally, by way of the Social Security Amendments of 1950,[68] state AFDC plans were required to:

(10) effective July 1, 1952, provide for prompt notice to appropriate law enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent;

As time progressed, Congress became aware that this notice provision was ineffective in "securing support from the deserting or abandoning parent in every possible case."[69] It attributed this failure, in significant part, to the "lack of authority for the [State] welfare agencies to reimburse the law enforcement agencies with Federal sharing, for their expenses."[70] In response, Congress enacted a new AFDC plan requirement in 1967. It required state plans to:

(18) provide for entering into cooperative arrangements with appropriate courts

**66.** Consider, for example, the following subsections: "(1) provide that it shall be in effect in all political subdivisions of the State;" "(2) provide for financial participation by the State;" (6) provide that ... the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application ... ;" "(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;" "(11) provide that amounts collected as support shall be distributed as provided in section 657 of this title."

**67.** *Cf. Townsend v. Swank*, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) (§ 602(a)(10) eligibility while attending college mandatory, and Illinois practice discontinuing benefits at age 20 regardless of college attendance invalid; § 602(a)(10) language construed was that a state plan "must provide ... that aid to families ... shall be furnished with reasonable promptness to all eligible individuals)"; *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (Alabama regulations, denying aid to children when a man was living with or visiting the natural mother, was invalid because it did not provide aid to the eligible child, as *required* by §§ 602(a), 606(a)).

**68.** Pub.L. No. 734, ch. 809, § 321(b), 64 Stat. 477, 549–50 (1950).

**69.** H.R.Rep. No. 544, 90th Cong., 1st Sess. 100 (1967). See also S.Rep. No. 744, 90th Cong., 1st Sess. 163, *reprinted in* 1967 U.S.Code Cong. & Ad.News 2834, 2997–3000.

**70.** H.R.Rep. No. 544, 90th Cong., 1st Sess. 102 (1967); S.Rep. No. 744, 90th Cong., 1st Sess. 161, *reprinted in* 1967 U.S.Code Cong. & Ad. News 2834, 2997; 113 Cong.Rec. H. 23055 (daily ed. Aug. 17, 1967) (remarks of Rep. Mills).

and law enforcement officials (A) to assist the State agency in administering the program referred to in clause (17)(A) [a Title IV–A program for establishing paternity and obtaining child support], including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the State agency or local agency administering the State plan.[71]

Thus "cooperative arrangements" were born, and federal matching funds made available.

In 1975, the Social Security Act amendment before us was enacted. The provision for cooperative arrangements, however, was substantially identical to its precursor, 42 U.S.C. § 602(a)(18), quoted above. Both the current and former sections required that state plans must "provide for entering into cooperative arrangements with appropriate courts and law enforcement officials..." Congressional explanation of this provision is both scarce and cursory. A United States Senate report succinctly stated that "[t]he State welfare agency is ... *required to enter into* cooperative arrangements with the courts and with law enforcement officials to carry out this program."[72] Similarly, reference was made that under the section's precursor "states [were] *required to enter* financial arrange-

ments with courts and law enforcement officials in order 'to assure optimum results.'"[73] By contrast, when Congress subsequently amended the IV–D program in 1980 to provide further, direct federal assistance to states for enforcement activities, it merely tracked the statutory language in explaining that "[p]resent law requires that State child support plans *provide for entering into* cooperative arrangements with appropriate courts and law enforcement officials."[74]

The legislative history, recited above, is not conclusive on the fine-tuned interpretation we are called upon to render. We do not find a clear and conclusive answer to our interpretative quest among the few sparse congressional statements in explanation of Section 654(7). We are reluctant to conclude that Congress expressed an absolute intent with its summary explanation that the states were "required to enter into cooperative arrangements,"[75] that is that they were required to reach agreements with their courts and certain officials or lose the opportunity to participate in the program. One court or one official could veto an entire state's participation by refusing to agree.

We do derive, however, a clear indication that Congress did *not* intend to leave the matter of cooperative agreements to state discretion. Nothing in the Act's legislative history indicates that this construction of

---

71. Social Security Amendments of 1967, Pub.L. No. 90–248, § 201(a)(1)(C), 81 Stat. 879 (1968) (amending 42 U.S.C. § 602(a)).

72. S.Rep. No. 93–1356, 93d Cong., 2d Sess. 2, 44–45, *reprinted in* 1974 U.S.Code Cong. & Ad. News 8133, 8134, 8148 (emphasis added). The AFDC program, as discussed *infra*, is a federal-state cooperative effort. The states need not administer an AFDC program, but if they choose to do so—thus availing themselves of significant federal financial incentives—they must establish AFDC plans which are consistent with federal guidelines. Thus, Section 654(7), like its precursor, is one of many requirements placed upon state AFDC plans as a condition of receiving federal funds.

73. S.Rep. No. 93–1356, 93d Cong., 2d Sess. 50, *reprinted in* 1974 U.S.Code Cong. & Ad.News 8133, 8153 (emphasis added).

74. Social Security Disability Amendments of 1980, S.Rep. No. 96–408, 96th Cong., 2d Sess. 66 (1979), *reprinted in* 1980 U.S.Code Cong. & Ad.News 1277, 1344.

75. Moreover, we find no indication, or possible presumption, that Congress acquiesced in any known agency or judicial interpretation of this provision, by its readoption of the precursor section's language.

HHS's position has not been formally published, and there is no indication that Congress acquiesced in the agency's practice by readopting the prior language in § 654(7). Rather, congressional statements made in the course of enacting the IV–D program indicate that more rigorous federal direction of child support enforcement was intended by the 1975 amendments.

Section 654(7) would be proper. Rather, the legislative history indicates that Congress was placing strong pressure to make cooperative arrangements. When the statute and its legislative history are considered in tandem, the wholly "discretionary" construction placed upon Section 654(7) by HHS and Mississippi is contrary to congressional intent.[76] Instead, read together, these interpretative sources indicate that states "must provide for entering into cooperative arrangements" whether or not the individual states believe them necessary. They further indicate that Congress envisioned that cooperative arrangements would actually be effected in each state, and not merely paid lip service in the states' plan provisions.

As a practical matter, however, Congress could not reasonably have intended the absolute requirement, imposed by the district court's interpretation and argued by appellants. State courts are independent governmental bodies. They cannot be compelled by the state to enter into cooperative agreements if they decline to do so. Similarly independent are many of the "appropriate" law enforcement officials, including the district and county attorneys in Mississippi. If Section 654(7) were meant to require agreement, the states would be in a difficult, if not impossible, situation. The refusal of law enforcement officials to agree would mean, presumably, that the state must cease using the services of these officials for enforcement purposes; the attendant loss of this valuable manpower

could not have been intended by Congress. Even more significant, if courts were to refuse to enter into cooperative arrangements, the states would be in a totally impossible position: they could not comply with the statute, even if enjoined, despite their best efforts toward compliance.

It is axiomatic that courts, in interpreting the words of Congress, are to avoid reaching a construction that results in absurd or unreasonable consequences.[77] Applying this principle to the immediate case, we do not believe that Congress could have intended by Section 654(7) to place the states in an impossible predicament or to affect the independence of state branches of government, even if it could. We do find, however, that Congress intended Section 654(7) as a requirement upon the states to do all that they reasonably could, towards effecting cooperative arrangements. The language compels bargaining to reach arrangements if arrangements are possible. But it does not compel arrangements.

This construction of Section 654(7) requires the states to enact all enabling legislation, and to remove any statutory impediments to entering into cooperative arrangements. Further, with regard to the "appropriate" independent bodies such as the courts, the states must, in good faith, make reasonable efforts to secure cooperative arrangements. The independence of these courts or officials does not affect the states' genuine duty to seek agreements in furtherance of congressional intent.[78] The

---

**76.** Since the Department's interpretation finds no support in the statutory language or legislative intent, we are not bound to defer to the agency's informal construction. *See* the discussion at notes 59–61 *supra.*

**77.** *See* the cases cited at note 51 *supra.*

**78.** In this regard, the states may not decline to offer, in good faith, cooperative agreements to appropriate courts and officials. Appellants' offered justification for refusing to do so—for fear of "insulting" the judiciary and attorneys—would be both specious and unacceptable.

The states must apprise their appropriate courts and law enforcement officials of the cooperative arrangements which they offer. This written notice, as well as whatever subse-

quent contracts occur, should strongly urge agreement and stress the need for and benefits of such agreements, including the attendant federal financial incentives within the IV–D program. Should any appropriate courts or law enforcement officials unequivocally decline to enter into such arrangements, the states need not continue to press for agreement. If there comes to the attention of the state a substantial change in circumstances, however, affecting the need for or possibility of agreement, the states' duty to undertake to seek agreement in good faith again arises. The district court, upon remand, should define these obligations in its order and set forth a reasonable timetable for state compliance.

Congress can pressure agreement, and has done so. But serious issues arise if internal agreements among state agencies and officials is compelled. Absent firm and compelling proof of congressional intent, we do not find such compulsory agreement mandated by the statute.

## CONCLUSION

We affirm the district court's conclusion that Section 602(a)(28) requires the states to consider *all* child support monies collected in any particular month in supplying funds to AFDC recipients up to the amount that would affect eligibility. Child support payments in addition to those amounts properly can be used by the state to reimburse itself for both present and past AFDC payments it has made to the AFDC recipients. Accordingly, the district court properly determined that the limitation to the contrary which Mississippi followed was invalid as were the Health and Human Service guidelines which permitted the Mississippi limitation.

We disagree, however, with the district court's determination that cooperative arrangements, pursuant to Section 654(7), must be made. We find that the states must legislatively clear the way for such arrangements and must undertake good faith, firm, reasonable efforts to establish cooperative arrangements with their courts and officials. We therefore reverse, and remand to the district court to enter an order consistent with this opinion.

AFFIRMED IN PART; REVERSED and REMANDED IN PART.