947 F.2d 21
 Eva DOUCETTE, et al., Plaintiffs, Appellees,
v.
H. Rollin IVES, Commissioner of the Maine Department of
Human Services, Defendant, Appellee,
Louis W. Sullivan, M.D., Secretary of Health and Human
Services, Defendant, Appellant.
Eva DOUCETTE, et al., Plaintiffs, Appellants,
v.
H. Rollin IVES, Commissioner of the Maine Department of
Human Services, et al., Defendants, Appellees.
Eva DOUCETTE, et al., Plaintiffs, Appellees,
v.
H. Rollin IVES, Commissioner of the Maine Department of
Human Services, Defendant, Appellant.
 Nos. 90-2229, 91-1017 and 91-1212.
 United States Court of Appeals,
First Circuit.
 Heard May 6, 1991.
Decided Oct. 21, 1991.
 
 Deborah Ruth Kant, Appellate Staff, Civ. Div., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., Richard S. Cohen, U.S. Atty., Portland, Me., and Barbara Biddle, Appellate Staff, Civ. Div. Dept. of Justice, Washington, D.C., were on briefs for Louis W. Sullivan.
 James R. Crotteau, Pine Tree Legal Assistance, Inc., Machias, Me., for Eva Doucette, et al.
 Christopher C. Leighton, Deputy Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., Augusta, Me., were on briefs for H. Rollin Ives.
 Before CAMPBELL, Circuit Judge, BOWNES, Senior Circuit Judge, and TORRES,* District Judge.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 This consolidated appeal involves two interrelated Social Security Act programs designed to benefit certain poor families: the Aid to Families with Dependent Children (AFDC) program, 42 U.S.C. §§ 601-610; and the Child Support Enforcement (CSE or "IV-D") program, 42 U.S.C. §§ 651-666. The plaintiff class challenges a Health and Human Services regulation governing the extent to which child support payments collected on behalf of AFDC recipients from the absent parent via the interception of state and federal tax refunds may be retained by the state as reimbursement to the state and federal governments for past AFDC payments. As defined by the district court, the class consists of Maine AFDC recipients affected by the regulation as of the date the motion for class certification was filed, September 6, 1988. Defendants-appellants are H. Rollin Ives, the Commissioner of the Maine Department of Human Services (DHS) and Dr. Louis Sullivan, Secretary of Health and Human Services (HHS), the federal agency charged with administering the programs.
 
 I.
 
 2
 The AFDC program is a cooperative federal-state program administered by the states. The program was established to "encourag[e] the care of dependent children ..., to help maintain and strengthen family life and to help such parents and relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection...." 42 U.S.C. § 601. The AFDC program provides assistance to families deprived of the support of one parent through death, illness, mental incapacity or, in some states, unemployment. 42 U.S.C. §§ 606, 607. Families are eligible for AFDC assistance if their "countable income"[1] falls below the "standard of need"[2] established by the state. Although in most states the AFDC payment is sufficient to cover the full amount by which a family's income falls below the established standard of need, some states provide less than the full amount, leaving a gap between the family's resources and the standard of need. These states are called the "gap states." See 42 U.S.C. § 602(a)(28). Maine is one such state.
 
 
 3
 Before 1975, child support payments received by a family in a given month were included in "countable income" for that month for the purposes of determining the family's eligibility for AFDC. If the family's earnings, plus any child support received, exceeded the "standard of need," the AFDC parent would be ineligible for assistance that month. In 1975, the law was amended to provide that child support payments would no longer be included in countable income. Rather, the state could require individuals to assign to the state their rights to child support as a condition of AFDC eligibility, 42 U.S.C. § 602(a)(26).
 
 
 4
 The collection and distribution by the state of child support payments so assigned is governed by the Child Support Enforcement Act, 42 U.S.C. §§ 651-666, Title IV-D of the Social Security Act. The CSE program is designed both to assist parents in collecting child support from absent parents and to reduce state and federal government AFDC expenditures, which are often necessitated by the failure of noncustodial parents to meet their support obligations. All states participating in the AFDC program are required to have child support collection programs, 42 U.S.C. § 602(a)(27), through which they assist families in establishing paternity, locating parents, and collecting support through wage withholding, liens on property, and withholding from unemployment compensation and tax refunds. 42 U.S.C. §§ 654, 664, 666.
 
 
 5
 Child support collected by the state under a IV-D program is distributed according to the following scheme: first, fifty dollars goes directly to the AFDC family in addition to any AFDC grant, 42 U.S.C. § 657(b)(1); second, any amount in excess of the fifty dollars goes to the state and federal government as reimbursement for that month's AFDC payment, 42 U.S.C. § 657(b)(2); third, after the AFDC payment for that month is reimbursed, the balance of the support payment for that month goes to the AFDC family. In other words, the family will receive either the amount of the current support payment or the AFDC payment, whichever is larger. Finally, if the amount collected represents past due child support (arrearage), the excess support goes to the state and federal government for past unreimbursed AFDC payments, 42 U.S.C. § 657(b)(4)(A). If there are no unreimbursed past AFDC payments outstanding, the balance goes to the family under § 657(b)(4)(B).
 
 
 6
 In states in which the AFDC payment was sufficient to make up the full difference between the family's countable income and the standard of need, the 1975 amendment providing for the assignment of support payments to the state did not make a difference in the family's resources. In such states, support payments received directly by the family would have reduced dollar-for-dollar the amount of the AFDC payment. In gap states, however, support payments received directly by the family prior to 1975 could be used to fill the gap between the family's resources (including AFDC) and the standard of need, without reducing the AFDC payment. In those states, assignment of support payments to the state under the IV-D scheme would mean that the funds would be used to reimburse the AFDC payments made by the state, whether or not the family reached the state's minimum standard of need.
 
 
 7
 Realizing that AFDC families in "gap states" could be worse off under the CSE program, Congress enacted 42 U.S.C. § 602(a)(28), providing that child support collected by the state should be used as supplemental AFDC payments to fill the gap between the standard of need and the state's actual monthly AFDC payment standard. The section requires that state AFDC plans:
 
 
 8
 (28) provide that, in determining the amount of aid to which an eligible family is entitled, any portion of the amounts collected in any particular month as child support pursuant to a plan approved under part D of this subchapter, and retained by the State under section 657 of this title, which ... would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount of aid otherwise payable to such family under the State plan approved under this part.
 
 
 9
 42 U.S.C. § 602(a)(28). In other words, in a gap state, collected child support must first be used to fill the gap before such funds may be used to reimburse the state and federal governments for AFDC payments. After the establishment of the CSE program in 1975, Congress established a number of specific tools to be used by states in collecting child support payments. One such tool is the federal tax refund intercept statute. 26 U.S.C. § 6402(c), 42 U.S.C. § 664(a)(1). Section 664 permits the federal government through the Secretary of the Treasury to intercept any federal tax refunds, offset any past-due child support under Title IV-D, and remit the child support to the state.[3] The tax refund intercept program applies to past due support payments and provides that the amounts collected be distributed according to § 657(b)(4). Subsection (b)(4) provides that the support collected be remitted to the state and federal government for unreimbursed past AFDC payments, 42 U.S.C. § 657(b)(4)(A), or, if there are no outstanding unreimbursed AFDC payments, to the AFDC family, 42 U.S.C. § 657(b)(4)(B).
 
 
 10
 In 1986, Congress added section 666, which created a number of additional methods for state collection of support payments, including a state tax refund intercept, 42 U.S.C. § 666(a)(3)(A), liens against personal and real property, 42 U.S.C. § 666(a)(4), and wage withholding, 42 U.S.C. § 666(a)(8), among others. Like the federal tax refund intercept, the state tax refund intercept provides that any amount collected be distributed in accordance with section 657(b)(4).
 
 
 11
 The regulation at issue in this appeal, 45 C.F.R. § 232.21(a), concerns the relationship between the federal and state tax refund intercepts and section 602(a)(28), the gap payment provision.[4] The Secretary's regulation effectively excludes from the scope of the gap provision any past-due child support obtained from federal or state tax refund intercepts. On September 6, 1988, plaintiffs filed suit in United States District Court for the District of Maine, seeking invalidation of the regulation and a declaration that Maine's IV-D program was not in compliance with 42 U.S.C. § 602(a)(28). Plaintiffs argue that, under 42 U.S.C. § 602(a)(28), any child support collected through the tax intercept program must first go to fill the AFDC family's gap in the month the refund was intercepted. Both the Commissioner of the Maine Department of Human Services and the Secretary of Health and Human Services were named as defendants.
 
 
 12
 The district court concluded that the Secretary's regulation was inconsistent with § 602(a)(28) and therefore invalid. The court held that section 602(a)(28)'s intervening directive applied to all collected support "retained by the state under section 657." As the tax refund intercept directs distribution according to § 657(b)(4), the court determined that section 602(a)(28) applied to the tax refund intercept. Focusing on Congress' purpose in enacting section 602(a)(28)--to fill the gap between the state payment standard and the state standard of need and to make up for that loss engendered by the assignment of child support under § 602(a)(26)--the district court could find no basis for distinguishing support payments collected through tax intercepts from those collected by other methods. The court relied in part on Quarles v. Saint Clair, 711 F.2d 691 (5th Cir.1983), in which the Fifth Circuit rejected the argument that gap payments could only consist of current collected child support and not arrearage. Id.
 
 
 13
 In its original order, the district court defined the class according to the plaintiff's motion for certification, including all families eligible for AFDC who had assigned their child support rights to DHS as of November 1985 and whose gap payments had been or would be reduced as a result of the challenged regulation. Following the entry of the order, the state defendants filed a motion for reconsideration, arguing that the relief granted to the class violated the Eleventh Amendment. The court granted the motion and revised the definition of the class to include only those families affected by the regulation who were eligible for AFDC as of the date the suit was commenced and the motion for class certification filed, September 6, 1988. 745 F.Supp. 763. Both the plaintiff and the state defendant challenge the revised definition of the class.
 
 II.
 
 14
 A. 45 C.F.R. § 232.21(a) and the Gap Provision.
 
 
 15
 The Supreme Court has established standards for assessing challenges to an agency's interpretation of its governing statute. First, the reviewing court should determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's construction is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. at 2782. Here, we believe the statutory language is clear--Congress has spoken directly to the issue at hand. We, therefore, affirm the district court's invalidation of the Secretary's regulation.
 
 
 16
 Realizing that families in gap states could be made worse off by assigning their child support rights to the state under 42 U.S.C. § 602(a)(26), Congress added the gap payment provision, section 602(a)(28), requiring states to use funds retained under § 657(b) first to fill the gap between family's income and the state standard of need. In contrast, the Secretary's regulation directs that amounts collected through tax intercepts are to be used to reimburse the state and federal governments for past AFDC payments without first being used to "fill the gap" for the month in which the funds were collected. By circumventing the gap provision, the regulation conflicts with the plain language of § 602(a)(28) and undermines Congress' purpose of eliminating any penalty upon AFDC families in gap states resulting from the assignment of child support rights to the state.
 
 
 17
 The Secretary argues that the regulation follows from the clear language of the federal tax intercept provision. He insists that the specific language of 42 U.S.C. § 664, directing the amounts collected pursuant to the provision be distributed "in accordance with 657(b)(4)," controls the general language of § 602(a)(28). This direction in the tax intercept provision and the absence of any reference to the gap provision indicate, according to the Secretary, that Congress intended state and federal governments to be the exclusive recipients of intercepted amounts, overriding the requirement of the gap provision that amounts collected as child support in gap states be added to a family's AFDC payment. Section 657(b)(4) requires that past-due child support first be used to repay the state and federal government's unreimbursed past AFDC payments before any of the money is distributed to the family. 42 U.S.C. § 657(b)(4). The Secretary contends that, even were the language of section 664 uncertain as to the effect of the gap provision, the Secretary's interpretation is reasonable and must, therefore, be given controlling weight. See Sullivan v. Everhart, 494 U.S. 83, 110 S.Ct. 960, 964-65, 108 L.Ed.2d 72 (1990).
 
 
 18
 While the Secretary's argument may initially seem plausible, it fails because it ignores the plain wording and operation of the gap provision. That provision, section 602(a)(28), states that in determining the amount of aid to which a family is entitled, "any portion of the amounts collected in any particular month as child support pursuant to a plan approved under part D of this subchapter, and retained by the State under section 657 of this title, which would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount otherwise payable to such family...." 42 U.S.C. § 602(a)(28) (emphasis supplied). By ordering the diversion to gap state families of "child support ... retained by the state, under section 657," the gap provision recognized that section 657 provided for the state's retention of amounts collected as reimbursement for its AFDC expenditure. Nonetheless, it was expressly those amounts of child support "retained by the State" that § 602(a)(28) ordered, in certain instances, to be diverted back to families in gap states. Thus the direction of section 664 to distribute tax intercepts "in accordance with 657(b)(4)" did no more than add tax intercepts to the pool of state-retained funds upon which the gap provision operated. No more than the original language of § 657(b) itself did the tax intercept provision nullify the effect upon § 657(b)(4) of the gap provision, which diverts to gap state families the collections otherwise "retained by the State under section 657."
 
 
 19
 Congress' direction that funds collected via the tax intercept be distributed according to § 657(b)(4) is not, therefore, at all inconsistent with the requirements of the gap provision. Nor is the interaction of the two provisions ambiguous. When an absentee parent owes past-due child support payments, the state may intercept a state tax refund or request the Internal Revenue Service to intercept a federal tax refund owed that parent. 42 U.S.C. § 664. Under § 657(b)(4), the subsection applicable to arrearages, funds so collected may be retained by the collecting state to the extent of unreimbursed AFDC payments made to the family. Once the state and federal governments are fully reimbursed, any balance remaining goes to the family. This is the standard distribution hierarchy established by Congress for state IV-D programs. Nevertheless, the relationship between state IV-D programs and state AFDC programs is further governed by the separate and further ordering of 42 U.S.C. § 602(a), which, in addition to requiring the establishment of child support collection programs and providing for the assignment of child support rights to the state, establishes the supplemental payment requirement for gap states.
 
 
 20
 Attempting to reconcile the regulation with the gap provision, the Secretary suggests that section 602(a)(28) "precedes" section 657--that child support collected by the state goes to fill the gap and the remainder is then distributed according to section 657. By specifying section 657(b)(4), the tax intercept provision channels the proceeds into the distribution hierarchy "downstream" from the gap provision and therefore such proceeds are not subject to diversion to fill the gap. This argument is contrary to the language of section 602(a)(28). In gap states, § 602(a)(28) simply directs that child support retained by the state under § 657 should first be used to fill the gap before being used to offset AFDC payments made by the state and federal governments. Rather than circumventing the gap provision, section 664 expressly brings the proceeds collected via the tax intercept within the scope of the gap provision by referring to section 657(b)(4).
 
 
 21
 The Secretary also points out that § 664 does not mention any distinction between gap and nongap states and, from this, concludes that in all states funds collected via the tax intercept should go directly to the state and federal government as reimbursement under § 657(b)(4). This argument ignores the structure of the AFDC and CSE statutes and the relationship between them. None of the specific collection mechanisms described in the CSE statute distinguish between gap and nongap states. See 42 U.S.C. § 666(a)(4) (liens); § 666(a)(6) (bonds and securities); § 666(b)(1) (wage withholding); § 654(19)(B) (garnishment, contempt, unemployment compensation interception). Moreover, section 657(b), which specifies the distribution of amounts collected, makes no such distinction. Rather, the distinction between gap and nongap states is found in § 602, the section of the AFDC statute which governs the relationship between the AFDC and CSE programs and includes the gap provision. Thus, given the statutory framework, Congress' failure to distinguish between gap and nongap states within the tax intercept provision itself cannot logically be read to render the gap provision inapplicable.
 
 
 22
 The legislative history of the 1975 amendments to the AFDC program and the creation of the CSE program reinforces this interpretation of the language of § 602(a)(28). After the passage of the 1975 amendments, Congress realized that "because of maximums in a few States in the amount of aid payable, certain recipients having child support income would lose some disposable income when [the IV-D program] was implemented." United States Senate, Committee on Finance, Child Support Data and Materials, 94th Cong., 1st Sess. 4--5 (Nov. 10, 1975). In response to this concern, both the Senate and the House passed virtually identical versions of bill that was to become § 602(a)(28), a measure designed to "permit child support payments to fill the gap between the standard and the actual payment level." House Comm. on Ways and Means, Child Support Program Improvements, H.R.Rep. No. 368, 94th Cong., 1st Sess. 5 (1975). The legislative history of § 602(a)(28) clearly indicates that Congress intended the section to alleviate the hardship wrought by the previously enacted IV-D program. In contrast, nothing in the legislative history of the amendments to that program, including the additions of the tax intercept provisions, indicates an intention to limit the scope of § 602(a)(28).
 
 
 23
 We agree, therefore, with the district court that the Secretary's regulation, 45 C.F.R. § 231.21(a), is invalid to the extent that it excludes amounts collected via the state and federal tax intercept provisions from the scope of the gap payment provision.
 
 
 24
 B. Eleventh Amendment Limits on Class Definition and the Scope of Relief.
 
 
 25
 Both the plaintiff class and the state defendant are dissatisfied with the district court's definition of the class. Plaintiffs contend that the district court erred in limiting the class to those families affected by the regulation as of the date of filing of the motion for class certification, September 6, 1988. The state defendant, on the other hand, argues that the class should be limited to families affected by the regulation as of the date judgment was entered, August 1, 1990. Put simply, there are three categories of families at issue: (1) families that were improperly denied gap payments prior to the commencement of the class action but who were no longer eligible for AFDC by the time the action was filed and class certification sought; (2) families affected by the regulation that were eligible for AFDC at or after the date of the commencement of the action[5] but who thereafter became ineligible during the pendency of the action; and (3) families affected by the regulation that continued to be eligible for AFDC assistance throughout the pendency of the action.
 
 
 26
 Neither side disputes, in respect to the class certification issue, that the third category of families, those affected by the regulation as of the date the district court's final order was entered, are entitled to whatever injunctive and notice relief[6] is appropriate in this case. They clearly belong to the class.
 
 
 27
 What is disputed is whether families in the first two categories properly belong to the class. This, in turn, depends upon whether the federal court has jurisdiction to grant any relief in respect to claims asserted by those families. Both the state and the plaintiffs agree that the Eleventh Amendment bars the award by a federal court of retroactive relief in the form of money damages payable from the state treasury, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). We must, therefore, consider whether, notwithstanding the limits imposed by the Eleventh Amendment, the federal court may properly grant relief to families who were adversely affected by the regulation but who were no longer eligible for AFDC as of the date of judgment.
 
 
 28
 As to the first category of families, those who were improperly denied gap payments in the past but who were no longer eligible for AFDC as of the date the suit was commenced, the only possible relief would be monetary damages for these past deprivations. See Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1982) (observing that '[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects') (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). While acknowledging that the Eleventh Amendment bars the award of damages payable from the state treasury, plaintiffs nonetheless argue that the district court is not barred from ordering the state defendant to pay such damages to the extent the state would or could be partially reimbursed by the federal government. See Bennett v. White, 865 F.2d 1395 (3d Cir.), cert. denied, 492 U.S. 920, 109 S.Ct. 3247, 106 L.Ed.2d 593 (1989); Fernandez v. Chardon, 681 F.2d 42 (1st Cir.1982).
 
 
 29
 This seems a problematic argument given the delays and uncertainties likely in the reimbursement procedure and the fact that, in the meantime, the court's judgment would seemingly have to be satisfied from the state's fisc, thus violating the Eleventh Amendment. But we need not and do not finally resolve this question.
 
 
 30
 Whatever the conceivable merits of the plaintiffs' argument, it is not ripe for consideration on this appeal because the necessary underlying facts relating to the possibility and means of federal reimbursement in this situation were never developed in the record so as to allow meaningful appellate analysis. Despite the fact that in its answer the state defendant raised the Eleventh Amendment as a bar to the relief sought by the plaintiff class, the plaintiff first raised its argument relative to recovery from the federal fisc in its opposition to the state defendant's request for reconsideration. The practical underpinnings of the issue were never fleshed out nor offered to be proven by the plaintiffs. Whether retroactive relief limited to the federal portion of the AFDC benefits would be a feasible way around the Eleventh Amendment necessitates a fact-specific inquiry concerning the impact of such an order on the state fisc. See, e.g., Galecor, Inc. v. Institute of London Underwriters, 729 F.Supp. 1101 (E.D.Pa.1990) (requiring additional briefing as to the feasibility of the recapture of federal funds by the state); Temple University v. White, 732 F.Supp. 1327 (E.D.Pa.1990) (denying such relief where the state would be required to expend funds to effect recapture of federal funds). The plaintiffs made no offer of proof as to the feasibility of limiting relief to federal funds, and no factual findings were made by the district court. As the plaintiffs failed to raise and develop this argument in the district court so as to support this theory of limited recovery, we decline to speculate on the issue on appeal.[7] In the circumstances and on the showing made, the district court plainly did not err in excluding the first category of families from the class.
 
 
 31
 The state defendant challenges the district court's inclusion of the second category of families in its amended class definition, i.e. those adversely affected by the regulation and eligible for AFDC as of (or after) the date the action was commenced but who became ineligible for AFDC before final judgment was entered. Citing Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), the state defendant contends that because such families could not themselves be entitled to injunctive or declaratory relief, the district court's grant to them of notice relief was improper. While the question is close, we agree.
 
 
 32
 At the outset, we note that it is irrelevant when, after the suit was brought, the district court actually certified the class. During the period between the commencement of a suit as a class action and the court's determination that it may be so maintained, the suit should be treated as a class action. See J. Moore, 3B Moore's Federal Practice p 23.50, 396-97 (2d ed. 1991) (and cases cited); C. Wright, A. Miller, M. Kane, Federal Practice and Procedure: Civil 2d § 1785, 106-07 (2d ed. 1986) (and cases cited). The issue is simply whether notice relief may be awarded to a class member who was wrongfully deprived of benefits at or after the commencement of the action but who, by the time of the judgment, had ceased to be affected by the invalid regulation. The Supreme Court has determined that notice relief is appropriate only when it is ancillary to some other form of relief properly granted by the district court. See Quern v. Jordan, 440 U.S. 332, 349, 99 S.Ct. 1139, 1149, 59 L.Ed.2d 358 (1978) (affirming an order of notice relief informing members of the class of the availability of a state administrative procedures). In Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), the Court ruled that notice relief was not available when no other relief, either damages, declaratory, or injunctive, could properly be granted. In Green, the Court noted that "a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed.' " 474 U.S. at 71, 106 S.Ct. at 427.
 
 
 33
 As already indicated, damages payable from the state fisc would, of course, not be appropriate relief that could be noticed. In Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that the doctrine of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permitting federal courts to grant injunctive relief against state officers for violations of federal law, did not extend to the award of money damages. In other words, injunctive relief that has the effect of ordering state officials to pay retroactive benefits from the state treasury is barred by the Eleventh Amendment. Edelman, 415 U.S. at 668-69, 94 S.Ct. at 1358-59. Thus, under Edelman, the district court could not have ordered the state to pay money damages for any denial of benefits by state officials prior to the entry of the court's order invalidating the regulation.
 
 
 34
 In Green v. Mansour, the Supreme Court held that declaratory relief, likewise, was not available when such relief related solely to past violations of federal law. 474 U.S. at 73, 106 S.Ct. at 428. Green involved two challenges to the administration of the state's AFDC program; however, during the pendency of the litigation, the state came into compliance with federal law. 474 U.S. at 66, 106 S.Ct. at 424. Thus, at the time of judgment, there was no ongoing violation of federal law as to which injunctive or declaratory relief could be ordered. Because declaratory relief would have related exclusively to the state's past practices, the Court held that it was barred by the Eleventh Amendment. To hold otherwise, the Court concluded, would permit an "end-run" around the Eleventh Amendment. Green, 474 U.S. at 73, 106 S.Ct. at 428.
 
 
 35
 Here, as in Green, there are no ongoing violations of federal law with respect to class members who are no longer eligible to receive AFDC (category two class members). We agree with defendant that relief granted to these class members relates to past violations of federal law and is therefore barred by the Eleventh Amendment. Because there is no valid prospective relief to which notice relief can be ancillary, we hold that under Green notice relief cannot be granted to the category two claimants.
 
 
 36
 Plaintiffs argue that this outcome would make Quern v. Jordan a superfluous case. They note that in Quern the Supreme Court approved notice relief even though Congress had abolished the welfare program at issue five years before the decision. We agree with plaintiffs that aspects of Quern are problematic in light of the holding in Green. As the dissenters in Green pointed out,
 
 
 37
 [i]t is not enough to distinguish the cases to observe that the notice relief in Quern was 'ancillary' to a prospective injunction because the 'prospective' injunction had been moot for three years before the Court of Appeals fashioned the notice relief and for five years before this Court approved it--Congress abolished the federal program at issue in Quern in 1974.
 
 
 38
 Green, 474 U.S. at 76 n. 2, 106 S.Ct. at 430 n. 2 (Brennan J. dissenting). Quern is silent, moreover, on whether members of the class who were no longer eligible for AFDC at the time the district court granted injunctive relief were entitled to the notice relief approved in Quern. Nevertheless, the peculiar factual circumstances of Quern do not negate the fact that, consistent with Green, prospective relief was granted before the dissolution of the Federal welfare program. The notice relief approved in Quern was ancillary to the grant of this "appropriate" relief.
 
 
 39
 Green did not overrule Quern. Speaking for the Court in Green, Justice Rehnquist--who also wrote the opinion in Quern--stated that "[o]ur review of the long, drawn-out Jordan litigation convinces us that neither the Court of Appeals nor this Court conceived of the requested notice allowed in that case to be an independent form of relief." Green, 474 U.S. at 71, 106 S.Ct. at 427. To the extent that Green is a clarification of Quern, any questions raised by Quern must be resolved by applying the analysis in Green. Green is the Court's last word.
 
 
 40
 We believe, therefore, that the district court's order declaring the challenged regulation invalid, and the notice relief granted ancillary to that order, were appropriate forms of relief for the category three class members but not for the category two class members. Under Green, notice relief cannot be granted to the category two complainants "independent of" an appropriate form of prospective relief. In this case, there is no form of prospective relief that can be granted to the category two complainants because, not being AFDC recipients any longer, their cases are moot.
 
 III.
 
 41
 For the forgoing reasons, we affirm the district court's order invalidating 45 C.F.R. § 232.21(a) to the extent that it excludes amounts collected via the state and federal tax intercepts from the scope of the gap provision. We also affirm the district court's certification of the class defined as all families who were improperly denied supplemental AFDC payments as a result of the regulation on or after[8] September 6, 1988. We likewise affirm the court's grant of notice relief to the members of the class who were still eligible for AFDC at the time of the district court's judgment. We reverse the district court's grant of notice relief to class members who were no longer eligible for AFDC at the time of the district court's judgment.
 
 
 42
 The judgment of the district court is reversed as to the grant of notice relief to class members no longer eligible for AFDC at the time of judgment; it is affirmed in all other respects. Each party shall bear its own costs.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation
 
 
 [1]
 "Countable income" is income less certain costs incurred in earning the income, e.g. day care expenses. See 45 C.F.R. § 233.20(a)(7)
 
 
 [2]
 "Standard of need" is that amount of money the state determines to be necessary for subsistence of a family of a given size
 
 
 [3]
 Section 664 provides that:
 (1) Upon receiving notice from a State agency administering a plan approved under this part that a named individual owes past-due support which has been assigned to such State pursuant to section 602(a)(26) or section 671(a)(17) of this title, the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such individual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable he shall withhold from such refunds an amount equal to the past-due support, shall concurrently send notice to such individual that the withholding has been made ... and shall pay such amount to the State agency (together with notice of the individual's home address) for distribution in accordance with section 657(b)(4) or (d)(3) of this title.
 
 
 [4]
 45 C.F.R. § 232.21(a) provides that, for the purposes of calculating gap payments, arrearages "means all collections of past due support exclusive of those made through the Federal and State income tax refund offset."
 
 
 [5]
 See note 8, infra
 
 
 [6]
 Notice relief is "explanatory notice to members of plaintiff class advising them that there are state administrative procedures available by which they may receive a determination of whether they are entitled to past welfare benefits." Quern v. Jordan, 440 U.S. 332, 334, 99 S.Ct. 1139, 1141, 59 L.Ed.2d 358 (1978). In the instant case, the court ordered that notice of this nature be sent to members of the class
 
 
 [7]
 Plaintiffs also argue that the district court could order the Secretary to institute compliance measures against the state and thereby force the state retroactively to reimburse eligible class members for alleged "underpayments" without violating the Eleventh Amendment. We need not consider this argument as the plaintiff failed altogether to raise it in the district court and has therefore waived it on appeal. See, e.g., Sandstrom v. Chemlawn Corp., 904 F.2d 83, 87 (1st Cir.1990)
 
 
 [8]
 The actual language of the district court's order seemed to limit the class to families receiving AFDC on September 6, 1988. Both the plaintiff and the state defendant agree that, assuming September 6, 1988 is the relevant date for the definition of the class, the class should include those receiving AFDC on or after that date. The order should be so modified