Michelle HASSAN, on her own behalf and as next friend of Adam Hassan and Joseph Hassan, and Frances Diaz, on her own behalf and as mother and next friend of Emilio Aguirre, Yolanda Rodriguez and Ricardo Ramirez, Plaintiffs–Appellants,

v.

Robert WRIGHT, in his official capacity as Acting Director of the Illinois Department of Public Aid, Defendant–Appellee.

Nos. 93–2016, 93–2017.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1994.

Decided Jan. 17, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied March 3, 1995.*

---

* The Honorable Ilana Diamond Rovner took no part in the decision.

Gary H. Palm, Catherine Cardwell Mac-Carthy, Michele I. Slobod (argued), Mandel Legal Aid Clinic, Chicago, IL, for Michelle Hassan, Francis Diaz.

James C. O'Connell, Asst. Atty. Gen., Karen Elaine Konieczny (argued), Office of Atty. Gen., Chicago, IL, for Robert Wright.

Donna Morros Weinstein, James Goeser, Department of Health and Human Services, Region V, Office of General Counsel, Linda A. Wawzenski, Asst. U.S. Atty., Office of U.S. Atty., Chicago, IL, for U.S. amicus curiae.

Before POSNER, Chief Judge, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

### Background

Illinois residents Michelle Hassan ("Hassan") and her children Joseph Hassan and Adam Hassan, along with Frances Diaz

("Diaz") and her children Emilio Aguirre, Yolanda Rodriguez, and Ricardo Ramirez, receive benefits from the Aid to Families with Dependent Children ("AFDC") program, a combined federal/state welfare initiative. Emmanuel Shamoon is the father of Hassan's son, Joseph. A paternity order requires Shamoon to pay Michelle Hassan child support of $150 per month. Frances Diaz and her children Emilio Aguirre, Yolanda Rodriguez, and Ricardo Ramirez also receive Illinois AFDC benefits. Gabriel Ramirez is the father of Diaz' son, Ricardo. A support order requires Ramirez to pay child support of $90 per month to Diaz. Both Hassan and Diaz are required, as a condition of AFDC eligibility, to assign their and their childrens' rights to child support paid by their responsible relatives to the Illinois Department of Public Aid ("IDPA"). Whether federal and state law properly compel this assignment is the ultimate inquiry of this case.

The IDPA administers the AFDC program in Illinois subject to Congress' mandates and funding. In administering AFDC, the IDPA determines the amount a family needs to meet its essential living expenses. This amount is called the "standard of assistance" or "standard of need" and serves as the basis for calculating the amount the IDPA pays in AFDC benefits to needy families. Congressional directives also figure into the IDPA's calculation of how much to pay AFDC recipients.

One such directive is before us today. In 1975 Congress added Title IV–D to the Social Security Act ("IV–D"), Pub.L. 93–647, 88 Stat. 2351–2358 (codified as amended at 42 U.S.C. § 651 *et seq.*) and also amended Title IV–A. This congressional action in part requires recipients of AFDC payments to assign their child support to their state governments. The idea was to facilitate the collection of child support payments from the non-custodial parents of children that receive AFDC benefits. The IV–D statutes direct states to develop plans to establish the paternity of any child whose parent receives aid and to collect support directly from the parents of such children. *See* 42 U.S.C. §§ 654(4) & (5) & 602(a)(26); *see also* 1974 U.S.C.C.A.N. 8133, 8145–46.

At the time Congress passed IV–D and amended IV–A, twelve states, and Puerto Rico, allowed a gap between their AFDC recipients' standards of need and the non-exempt income (including AFDC payments) available to those recipients. These are called "gap states." AFDC recipients in gap states relied on child support to fill the gap between their standards of need and the level of aid paid by the state. Because they required AFDC recipients to turn child support payments over to their state AFDC administrators, the IV–D and IV–A amendments as originally passed would have seized cash (flowing from child support) upon which AFDC recipients in gap states, but not in non-gap states, relied. Consequently, AFDC recipients in gap states would have suffered a decrease in actual cash flow. The bargain that Congress negotiated, federal money in exchange for rights to child support payments, would have been meaningless for AFDC recipients in gap states. As a remedy, Congress immediately enacted the following addition to Title 42 of the United States Code:

§ 602(a). A state plan for aid and services to needy families with children must—

(28) provide that, in determining the amount of aid to which an eligible family is entitled, any portion of the amounts collected in any particular month as child support pursuant to a plan approved under part D, and retained by the State under section 657 [of this title], which (under the State plan approved under this part as in effect both during July 1975 and during that particular month) would not have caused a reduction in the amount of aid paid to the family if such amounts had been paid directly to the family, shall be added to the amount of aid otherwise payable to such family under the State plan approved under this part[.]

This statutory addition effectively restored child support payments to AFDC recipients in states that allowed gaps and gap filling in 1975.

Before IV–D, that is before August 1975, Illinois reduced a recipient's AFDC benefits dollar-for-dollar by the entire amount of child support payments received by that recipient. The IDPA determined how much money a family of a particular size needed, subtracted from that amount the child support the family received, and paid the family the difference. *See* Ill.Rev.Stat. (1975), ch. 23, §§ 4–1.6 & 12–4.11. Therefore, there was no gap in Illinois in 1975.

In 1981, however, the IDPA began paying AFDC beneficiaries less than the full standard of need. *Ill.Rev.Stat.* (1981) ch. 23, §§ 4–1.6, 4–2. Under the current rules, the IDPA determines a family's standard of need and deducts from that amount the non-exempt income the family already receives. The IDPA then pays the family some amount that, combined with non-exempt income, still amounts to less than the standard of need. The gap that Illinois currently allows gave rise to the dispute before us regarding the proper distribution of child support payments under IV–D.

In accord with the Illinois plan for distributing child support payments under IV–D, neither Hassan nor Diaz receive any of the support in excess of $50. Illinois treats the first $50 of child support as exempt income, meaning that, when the IDPA receives monthly child support payments in excess of $50 on behalf of an AFDC recipient, it pays $50 directly to the mother of the child. This first $50 has no effect on AFDC eligibility. 42 U.S.C. § 657(b)(1). Any amount over $50, however, is divided between the IDPA, to reimburse the state for its AFDC payments and to help defray the cost of the AFDC program, and the federal government, to reimburse it for federal matching costs of the AFDC program. 42 U.S.C. § 657(b)(2).

Claiming rights to that excess support, Hassan and Diaz filed separate complaints against Phil Bradley, who was at the time Director of the IDPA, in his official capacity.[1] The claims were combined on defendant's motion. Hassan and Diaz sought declaratory and injunctive relief, arguing that

§ 602(a)(28) requires the State of Illinois to pay them the full amount of child support it receives up to the full standard of need.

All parties moved for summary judgment. The trial court denied Hassan's and Diaz' motions and granted defendant's motion. 818 F.Supp. 1174. The district court held that § 602(a)(28) does not oblige the state to turn over the child support payments it collects to the recipient family, even if there is a gap, unless the state permitted gap filling with child support payments both in July 1975 and under its current plan. Hassan and Diaz appealed.

■ No material facts were disputed. The district court's ruling on the summary judgment motions, therefore, turned on its interpretation of 42 U.S.C. § 602(a)(28). We review *de novo* the district court's grant of summary judgment in favor of defendant. *Willie Green, III v. Whiteco Indus. Inc.,* 17 F.3d 199, 201 (7th Cir.1994).

### *Interpretation of 42 U.S.C. § 602(a)(28)*

Hassan and Diaz argue that § 602(a)(28) requires the IDPA to pay AFDC recipients the entire amount of the child support payments up to the standard of need if there is now a gap, even though Illinois allowed no gap in 1975. The crux of their argument is that § 602(a)(28) applies generally and should be read to require that child support payments must be used to fill the gap wherever and whenever such a gap occurs. They also argue that, had Illinois allowed a gap in 1975, Illinois law would have allowed child support payments to fill the gap; therefore, the statute should apply to Illinois even if read more narrowly to encompass only those states that would have allowed child support to fill any gaps that happened to appear in 1975 along with states that in fact did allow such gap filling. Finally, plaintiffs argue that Congress would have listed the gap states if it meant the statute to apply only to states that allowed gaps in 1975. Defendant counters that the plain language of the stat-

---

**1.** During the course of this appeal Robert Wright became the director of the IDPA and was substi- tuted for Bradley as Appellee.

ute demonstrates that it does not apply to Illinois.

■ Congress enacted § 602(a)(28) to prevent decreases in cash flow to AFDC recipients who in 1975 lived in states that allowed them to fill the gap with child support payments. Senator Long explained the purpose of the amendment as "permit[ing] states which now allow recipients to keep a portion of the child support payments they receive, to continue to do so in order to prevent a reduction of income by recipients." 121 Cong.Rec. S26754 (daily ed. August 1, 1975) (remarks of Sen. Long). Congress intended for the legislation to allow families that used child support payments for gap-filling at that time to continue to do so. Accordingly, § 602(a)(28) requires those states that in 1975 allowed a gap between their AFDC payments and the standard of need to continue to pay AFDC recipients all of the child support the state receives on their behalf up to the standard of need.

Section 602(a)(28) conveys the purpose Senator Long articulated by using the words "both" and "and" to indicate that the statute applies only to those states that allowed gap-filling in 1975: "(under the State plan ... as in effect *both* during July 1975 *and* during that particular month)". 42 U.S.C. § 602(a)(28) (emphasis added).

To demonstrate that Illinois must comply with § 602(a)(28) by filling the gap with money it has collected from child support payments, Hassan and Diaz must make three showings: (1) that Illinois failed to pay benefits up to the standard of need in 1975; (2) that Illinois, through a plan approved by the Secretary of Health and Human Services, allowed child support to make up the difference; and (3) that Illinois did not pay benefits up to the full standard of need in the month that Hassan and Diaz brought their claims.

In 1975 Illinois AFDC payments met the full standard of need. There was no gap, so there was no need for gap-filling. Even if there had been a gap in Illinois in 1975, child support was non-exempt income, meaning that the IDPA would have reduced any AFDC benefits by the amount of child support a beneficiary received—the amount of

the support payments would not have been used for gap-filling. And, separately, Illinois' Title IV–D state plan, which was approved by the Secretary of Health and Human Services, did not permit gap-filling with child support payments if there had actually been a gap. So even if Illinois *law* allowed gap-filling, the § 602(a)(28) requirement that the *plan* call for gap-filling is not met.

Nevertheless, Hassan and Diaz argue that two Circuit Courts of Appeals have refused to allow states to shirk their gap-filling responsibilities and that these decisions are instructive here. They cite *Quarles v. St. Clair*, 711 F.2d 691 (5th Cir.1983) and *Doucette v. Ives*, 947 F.2d 21 (1st Cir.1991). In *Quarles*, the Fifth Circuit concluded that Mississippi, a gap state both in July 1975 and when the suit was brought, could not withhold from AFDC recipients child support the state collected from delinquent parents. Instead, the state had to remit to AFDC recipients child support the state collected in arrears, along with child support it collected from current accounts, up to the standard of need. *Quarles*, 711 F.2d at 708. In *Doucette*, the First Circuit invalidated a federal regulation that exempted child support collected through intercepting the tax refunds of deadbeat parents from the scope of § 602(a)(28). *Doucette*, 947 F.2d at 28. *Doucette* required Maine, also a gap state in 1975 and at the time the suit was brought, to pay AFDC recipients child support collected through the tax intercept method, along with support collected more conventionally, up to the standard of need.

Neither of these decisions is persuasive authority in our situation because both address issues which face only those states that § 602(a)(28) otherwise reaches—states that filled the gap with child support both in 1975 and at the time the claim was brought. Contrary to Appellants' contention, *Quarles* and *Doucette* do not establish the principle that a state can never change its AFDC plan. Rather, these decisions merely hold that Mississippi and Maine could not, under § 602(a)(28), retain some narrow category of the total amount of support the state collected from the non-custodial parents. The reason is that these states did not pay benefits

up to the standard of need and, prior to Congress' 1975 enactment of IV–D, allowed custodial parents to collect both current and back child support directly from the non-custodial parent in amounts up to the standard of need without reducing their AFDC eligibility. In *Quarles,* the state transferred to custodial parents only current support but not back or excess support. In *Doucette,* the state transferred only support not collected by the tax refund intercept method. By allowing dichotomies between current payments and backpayments, or between tax-intercepted payments and payments collected through traditional methods, the states diminished the actual amount of cash a custodial parent would receive vis-a-vis the amount she received before Congress passed IV–D. Such diminution is exactly what Congress tried to avoid through the enactment of § 602(a)(28), and it is the touchstone for determining whether a state's AFDC program has run afoul of § 602(a)(28).

Notably, the adjustment to the Illinois plan in 1981 that spurred this litigation did not reduce the actual amount of cash that AFDC recipients receive. Instead, it merely adjusted the standard of need upward without adjusting its AFDC payments accordingly. While this adjustment may reflect the very real and harsh fact that AFDC recipients have less buying power now than in 1975, it does not leave AFDC families with less cash than they received in 1975. The 1981 adjustment, apart from the debate over whether § 602(a)(28) applies to states that allowed no gap in 1975, did not bring Illinois' troubles within the circumscription of § 602(a)(28)'s remedies. Even without § 602(a)(28), Illinois AFDC recipients, unlike Mississippi, Maine, and all the other gap states, would have benefitted from the IV–D trade of child support rights for federal money. But even more notably, Illinois was not a gap state in 1975, and neither *Quarles* nor *Doucette* stretch § 602(a)(28) to cover states that have become gap states since 1975. Therefore, § 602(a)(28) plainly does not apply to Illinois.

Hassan and Diaz also argue that Illinois' interpretation of the statute is unconstitutional. They theorize that AFDC recipients in states that have become gap states after the passage of § 602(a)(28) are similarly situated to those that lived in gap states before its passage. They argue that legislatively distinguishing between these two groups, i.e. providing benefits to one group but not the other, violates the equal protection clause.[2]

■ The equal protection clause "does not reject the government's ability to classify persons ... in the creation and application of laws." Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW, SUBSTANCE AND PROCEDURE § 18.2 at 7 (2nd ed. 1992). Courts must examine whether Congress' classification is irrational, invidious, or otherwise predicated on impermissible criteria:

> If the government classification relates to a proper governmental purpose, then the classification will be upheld.... Those who are treated less favorably by the legislation are not denied equal protection of the law because they are not similarly situated to those who receive the benefit of the legislative classification.

*Id.*

■ When reviewing class distinctions drawn in social legislation not pertaining to a fundamental right or a suspect class, "our review is limited to determining whether the statute is rationally related to legitimate legislative goals." *Lindley for Lindley v. Sullivan,* 889 F.2d 124, 132 (7th Cir.1989). Indigents do not compose a suspect class, and no fundamental right to public assistance exists under the Constitution. *Clark v. Prichard,* 812 F.2d 991, 995 (5th Cir.1987).

The Supreme Court in *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970), provided guidance for resolving cases like Hassan's and Diaz'. *Dandridge* explained, with regard to AFDC payments, that "[i]t is enough that the state's action be rationally based and free from invidious discrimination." *Id.,* 397 U.S.

---

**2.** Hassan and Diaz mislabel their argument as one based on due process but make an argument based on federal equal protection principles; therefore, we treat it as an equal protection argument.

at 486, 90 S.Ct. at 1162. The Court also noted that the judiciary is not empowered to "second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.*, 397 U.S. at 487, 90 S.Ct. at 1163.

Congressional regret drives, and at the same time justifies, the qualitative wedge between AFDC recipients in 1975 gap states and AFDC recipients in post–1975 gap states. When Congress enacted IV–D, it immediately realized that it had siphoned a means of cash upon which AFDC recipients in gap states depended. Out of a beneficent compulsion to abide by a political Hippocratic oath,[3] Congress rushed to avoid doing harm to these recipients. Through § 602(a)(28), Congress resuscitated the expectations of gap state AFDC recipients by restoring their child support.

Recipients of AFDC in post–1975 gap states do not fall into the same class whose expectations Congress tried to resuscitate. It is true that recipients in those states have seen their buying power, and thus their economic well-being, shrink as their AFDC benefits have failed to rise with their standards of need. But in 1975 Congress did not perceive itself as inflicting enough future harm to such recipients to justify a remedy, presumably because Congress itself had not interrupted a resource upon which AFDC recipients in future gap states already relied. Instead, Congress may have perceived the efficient cause of any such future harm to be the states that, knowing that gap-filling child support would be unavailable to their AFDC recipients, would nonetheless fail to pay benefits up to their recipients' standards of need. Accordingly, Congress did not include AFDC recipients in post–1975 gap states in the same class as the others who were more immediately affected by the confiscatory provisions of IV–D.

■ At bottom, protecting the fisc provides a rational basis for Congress' line drawing in this instance. Congress could easily calculate the number of gap state recipients in 1975, a calculation that told Congress exactly how much in benefits the government would be allowing through the IV–D program and its amendments. Congress enacted § 602(a)(28) based on this calculation, as the Constitution allows it to do. *Dandridge* teaches us that allocating scarce resources, if free from invidious discrimination, is a constitutionally proper basis for legislatively drawn class distinctions. The Constitution does not require Congress to refuse to tax (in the sense of confiscating child support payments) all possible AFDC recipients IV–D would burden in the future.

■ Hassan and Diaz raise two other issues. They claim under the Fifth and Fourteenth Amendments that Illinois has deprived them of their substantive due process rights by depriving them of both an adequate AFDC payment and the support payments of the fathers involved. Hassan and Diaz creatively cast their argument as one based on state deprivation of private rights of rescue as an alternative to an argument based upon affirmative rights to governmental aid. There is no affirmative right to governmental aid, even where the absence of such aid means the loss of life, liberty or property interests that the government may not affirmatively deny. *Rust v. Sullivan,* 500 U.S. 173, 201, 111 S.Ct. 1759, 1776, 114 L.Ed.2d 233 (1991); *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989).

This Circuit has recognized, at least in the context of impending loss of life, a right to private avenues of rescue. *Ross v. United States,* 910 F.2d 1422 (7th Cir.1990). In *Ross,* a drowning victim's mother brought suit against Lake County, Illinois, the city of Waukegan, and the United States seeking damages for her boy's death. The Lake County Deputy Sheriff had prevented a private party from attempting to rescue the boy at a time when the only officials allowed to save him, divers from the Waukegan Fire Department, were not yet on the scene. We ruled that, to the extent that Lake County

---

**3.** We borrow this helpful term from columnist George Will, who frequently invokes the adage that government should first do no harm. *See,*

*e.g.,* This Week With David Brinkley (ABC), Oct. 16, 1994, NEXIS transcript # 677.

had a policy prohibiting private parties from attempting to rescue others from drowning, the county violated the drowned boy's constitutional rights because it did not provide a meaningful rescue alternative. *Id.*

> [*Ross* ] is not like *DeShaney*.... [T]he wrong suffered by the plaintiff and her decedent is the county's forced imposition of services that William [Ross, the drowned boy] did not want or need; the plaintiff alleges that the county had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative.

*Id.* 910 F.2d at 1431. We held that any such policy was arbitrary because it preferred the safety and preservation of one life, that of the private rescuer, over another, the drowning boy. *Id.* at 1431.

■ Hassan and Diaz argue that this case is like *Ross* because the state deprives families of their rights to private rescue—to collect child support directly from non-custodial parents—without providing a meaningful alternative and that this policy deprives them of their rights to substantive due process.[4] Without stretching the *Ross* standard to apply in this particular context, we note that the government plainly does provide the plaintiffs with a meaningful alternative. Hassan and Diaz enjoy some level of AFDC benefits supplied by the government, plus the first $50 of any child support the state collects on their behalf. And they receive this benefit without incurring the expense and hassle of enforcing the fathers' child support obligations. These benefits may not meet their standards of need, but that does not render the amounts they do receive meaningless alternatives. The benefits must mean something to plaintiffs because they choose to receive them instead of eschewing the AFDC program and retaining their rights to collect child support directly from the fathers of their children. Were Hassan and Diaz to collect and retain child support in this manner, they would receive $150 and $90 per month, respectively. Under the AFDC program, where they surrender their rights to the child support, they receive $367 and $414 per month. If they were to reject the

AFDC trade-off, Illinois would plainly have no constitutional obligation to take affirmative action to ensure that Hassan's and Diaz' children had enough to eat. *Rust,* 500 U.S. 173, 201, 111 S.Ct. 1759, 1776; *DeShaney,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003. Plaintiffs make the rational choice to accept the governmental trade-off, which leaves them far better off than if they collected the child support themselves. What Hassan and Diaz really desire is for Illinois to pay them both the AFDC benefit and the full child support payments. Congress and the State of Illinois have decided against such generosity, but that does not render meaningless the benefits that the governments do provide.

■ Hassan and Diaz also argue that the statute should be construed to conform to "customary international law." The "customary international law" to which they refer arises from international treaties guaranteeing a minimum income. These are treaties the United States has thus far declined to ratify. Congress has had the chance to adopt these international standards, but so far has not done so. It did, however, choose to enact 42 U.S.C. § 602(a)(28).

We have no difficulty in determining that § 602(a)(28) controls.

AFFIRMED.

---

**4.** It is not clear which substantive right—life, liberty, or property—plaintiffs claim to have lost. However, we do not reach the point of having to

determine with any precision the nature of their claimed losses.